## BOKOSHE SMOKELESS COAL CO. v. BRAY *et al.*

No. 6169.　Opinion Filed January 25, 1916.

Rehearing Denied February 15, 1916.

(155 Pac. 226.)

1. **DAMAGES—Right to Recover—Proof.** Only such actual damages may be recovered as are established by the proof of facts from which they may be rationally inferred with reasonable certainty; and substantial, competent evidence of the facts which constitute the cause of action is indispensable to the maintenance of a verdict. Conjecture is an unjust and unsound basis for a verdict, and speculative, remote, or contingent damages cannot form the basis of a lawful judgment. Juries may not legally guess the money out of one litigant's pocket into that of another.

2. **SAME—Proof of Amount—Sufficiency.** The estimates, speculations, or conjectures of witnesses, unfounded in the knowledge of actual facts from which the amount of damages could have been inferred with reasonable certainty, will no more sustain a judgment than the conjecture of a jury.

3. **SAME — Anticipated Profits — Right to Recover — Proof.** As a general rule, anticipated profits of a commercial or other like business are too remote, speculative, and dependent upon uncertainties and changing circumstances to warrant a judgment for their loss. The exception to this rule is that the loss of profits from the destruction or interruption of an established business may be recovered where it is made reasonably certain by competent proof what the amount of the loss actually is; and such damages, must be established, not by guess work, conjectures, uncertain estimates, or mere conclusions, but by tangible facts from which actual damages may be logically and legally shown or inferred.

(Syllabus by Robberts, C.)

*Error from District Court, Le Flore County;*
*W. H. Brown, Judge.*

Action by A. F. Bray and another against the Bokoshe Smokeless Coal Company, a corporation. Judgment for plaintiffs, and defendant brings error. Reversed and remanded.

*Keaton, Wells & Johnston,* for plaintiff in error.

*R. P. White* and *T. H. Du Bois,* for defendants in error.

Opinion by ROBBERTS, C.   The parties herein will be designated plaintiffs and defendant, as they were below.   A. F. Bray and D. M. Schimmel brought this action in the district court of Le Flore county against the Bokoshe Smokeless Coal Company, a corporation, to recover damages for eviction and loss of future profits in the operation of a certain coal mine, which plaintiffs held as assignees of a lease from defendant.

Plaintiffs allege, in substance, that on the 15th day of December, 1912, and prior thereto, they were in peaceable possession of a certain coal mine, known as "mine No. 4," which they were holding under a lease dated August 6, 1908.   They also allege that they had placed valuable improvements upon the property and had expended money thereby and thereon, and that they could and would have produced a large amount of coal therefrom to their profit in the sum of $500 per month during the remaining term of their lease, which was to expire on the 5th day of August, 1913, and that they were at the time in possession of a large amount of personal property upon said premises, consisting of boilers, fans, pumps, cables, and various other equipments used in connection with said mine, aggregating in value the sum of $4,295; that while in possession of said mine they had made improvements thereon to the amount of $2,000, and that said defendant, on or about the 15th day of December, 1912, had entered upon said premises without right or authority and took possession of the same, including said coal mine and all machinery and equipments connected

therewith, as well as the personal property thereon belonging to plaintifis, and converted the same to its own use, whereby plaintiffs were damaged in the sum of $10,295.

The lease upon which plaintiffs rely for possession contains certain provisions, among which are paragraphs 7 and 8, as follows:

"(7)  The said subcontractors further covenant and agree that they will not at any time during the term of this contract assign, either voluntarily or involuntarily sublet, or transfer the same, or any part thereof, to any person or persons or corporation whatsoever, without the written consent of the said contractor under its seal having been first obtained.

"(8)  It is further understood and agreed by and between the parties hereto that, in the event that the said subcontractors shall delay or refuse or fail to perform and comply with the terms of this contract in the payment of royalty or in the manner of the working of the said mine or mines or to keep and perform the covenants and agreements herein stipulated on their part to be performed, the contractor, at its option, shall have the right, after 60 days' notice to the said subcontractors, to re-enter upon said land in as full and complete possession as if the terms of this contract were fully performed and ended by limitation."

It also appears from the petition, including the exhibits attached thereto, that the original lease referred to was in favor of other parties, and that the plaintiffs herein were holding under an assignment of said lease. The assignment of the lease to the plaintiffs contains the following provisions:

"This contract made this the 6th day of July, 1912, between Edward Henderson, hereinafter known as the party of the first part, and A. F. Bray and D. M. Schim-

mel, parties of the second part witnesseth: That the party of the first part has a certain lease or contract covering mine No. 4 in Bokoshe, Le Flore county, Okla., from the Bokoshe Smokeless Coal Company, and has contracted, and by these presents does contract, with the parties of the second part, that said parties of the second part are to operate said mine during the term of said lease for their own interest and profit, and that for and in consideration of this contract the said parties of the second part are to pay to the party of the first part, the sum of five cents for each and every ton of coal produced from said mine No. 4, said money to be paid through the office of the Bokoshe Smokeless Coal Company.

"It is further agreed that at the expiration of said lease from the Bokoshe Smokeless Coal Company that the party of the first part is to obtain a renewal of same under the same terms specified therein, and that this contract will cover said renewal for the same term. Party of the first part, Edw. Henderson. Parties of the second part, A. F. Bray, D. M. Schimmel."

The defendant answered: (1) By general denial; (2) the admission of the execution of the original lease and also the assignment thereof to plaintiffs, but denying the authority of the party making said assignment; (3) that whatever rights plaintiffs had in said premises they were holding under and by the terms of said lease and the assignment thereof; (4) defendant denies that it unlawfully or forcibly took possession of said mine and the equipments and personal property claimed by plaintiffs, and alleges that, when it did acquire possession, it was because of the fact that plaintiffs had long prior thereto abandoned said mine and refused to operate the same; (5) that defendant and its officers did not know until December, 1912, that plaintiffs had taken possession of said mine and were operating the same, and further allege

that plaintiff Bray, through certain misrepresentations, had induced the local superintendent of the defendant to make large loans and advancements to plaintiffs aggregating $3,801.55, covering material bills, labor bills, and various other items, and had induced defendant's superintendent to guarantee the pay roll of the plaintiffs in the operation of said mine, and that said plaintiffs abandoned said mine on or about the 15th day of December, 1912, and allowed it to remain idle and unused, and on or about the 3d day of February, 1913, defendant took possession thereof, with the equipments therein, for the purpose of preventing damage to said mine, and began operation thereof; (6) that on or about the 30th day of December, 1912, defendant caused notice of the termination of the original lease to be served on the lessees named in said lease and described as subcontractors therein, and gave public notice of its withdrawal as surety upon plaintiffs' pay roll, which was duly served upon plaintiffs, and defendant further alleged that by reason of the abandonment by plaintiffs of said mine it was damaged in the sum of $1,000; (7) to secure defendant on its account for advancements amounting to $3,801.55 made to plaintiffs, they did, in the name of the Bokoshe Mining Company, execute a note to defendant in the sum of $2,000, and secured the same by chattel mortgage on all the equipments owned or claimed by them in and about said mine, and defendant further claimed and alleged additional credits and advancements made by it to plaintiffs, aggregating in all the sum of $5,237, for which it prayed judgment.

The case was tried to a jury. Two interrogatories were submitted by the court, as follows:

(1) "Do you find from the evidence that plaintiffs were wrongfully evicted from the mine in question?   A. Yes."

(2) "If you answer the foregoing interrogatory in the affirmative, then state how much, if anything, you allow plaintiffs' for loss of profits occasioned by such wrongful eviction.   A.   $666.00."

Upon a general verdict of $666, judgment was entered by the court. A motion for new trial was filed, overruled, exceptions saved, and defendant brings error.

We gather from the record and briefs of counsel for both parties that there are three questions presented for determination:   (1) The validity of the assignment of the original lease to plaintiffs; (2) the eviction of plaintiffs by defendant; (3) the sufficiency of the evidence to sustain the judgment.

As to the first proposition the petition alleges, in substance, that plaintiffs' rights therein are secured by a certain lease dated August 6, 1908, together with "an assignment of said lease to plaintiffs, dated July 6, 1912." This particular allegation is met on the part of defendant by admitting the execution of the lease and assignment and a denial (unverified) of the authority of the party making the assignment.   We are of the opinion that these pleadings bring the case within section 4759, Rev. Laws 1910, which was in force at the time, and provides that:

"In all actions, the allegations of written instruments, and indorsements thereon, or of any appointment of authority,   *   *   *   shall be taken as true unless the denial of the same be verified by the affidavit of the party, his agent, or attorney."

Aside from this, there is some testimony, including the long list of accounts made by defendant and set out

in the record, showing that the defendant had recognized the plaintiffs, sometimes under the name of "Bray & Co." and at others under the name of "Bokoshe Mining Company," as the operators and lessees of said mine, thereby waiving the question as to whether they were in lawful possession of said premises under the lease. The matter was submitted to the jury, and by their verdict they found against the defendant upon that contention. Their finding in that behalf was approved by the trial court, and will not be disturbed here.

The second question is as to the eviction of the plaintiffs by the defendant at the time alleged. Counsel for plaintiff in error contend that there is no evidence whatever tending to prove an eviction. We cannot agree with counsel in that behalf. Upon that question plaintiff Bray testified as follows:

"Q. State in detail the conversation you had with him [Mr. Huber]. A. I don't remember the exact conversation—that is, word for word. I think both of us got very mad, and he cussed a little bit, and I cussed back, and it just ended up in a cussing match. He notified me that they had taken possession of the place, and that I couldn't have anything else to do with it. * * * Q. What did you say to Mr. Huber? A. I told you what we said at first, and I saw him two or three times after that, and once or twice he refused to talk, and I asked him for information what they had done, and he gave me definitely to understand that they had taken possession of the place, and that we could not operate it any longer. * * * He stated very plainly that we could not have anything to do with the place any more, saying further that we had been stealing, that I had run away, or something, and they were going to keep it, and two or three days after that I went to them and told them that the mine had filled up with water, and they had better get

some one and pump it out, and then he said I didn't have anything to do with it; that they would attend to the pumping."

And Henderson, one of the. original lessees, gave the following testimony:

"Q. When was this conversation you had with Mr. Huber? A. In the latter end of December some time. Q. What did you tell Mr. Huber? * * * A. I told him that I understood that he had taken charge of the mine. * * * Q. What did he say? A. He said he had."

There was other testimony tending to establish eviction, which we deem unnecessary to quote.

The court fully instructed the jury upon the law as to eviction in instructions 4, 6, and 7, which are as follows:

"(4) The court further instructs the jury that some act of interference by the owner of property with the tenant's enjoyment of the premises may be mere acts of trespass, or they may amount to an eviction. The question whether they partake of the latter character depends upon the intention with which they are done, and the character of the act. If they clearly indicate an intention on the landlord's part that the tenant should no longer continue to hold the premises, and he thereby loses the beneficial use of the same, this would constitute an eviction; otherwise they would amount to no more than mere acts of trespass. * * *

"(6) Forcible expulsion is not necessary to cause an eviction. Any act done in violation of the rights to the tenant without his consent which deprives him of the beneficial use and enjoyment of a material part of the premises leased will amount to an eviction. If the jury in this case believes from the evidence that the plaintiffs were in lawful possession of the said Mine No. 4, within the meaning of the term 'lawful pos-

session' as hereinbefore defined, and that the directors and officers of the defendant company took possession of said mine prior to the 30th day of December, 1912, without the consent of the plaintiffs, then the plaintiffs were evicted from said mine by the defendant.

"(7) You are further instructed that it was the duty of the plaintiffs, if they were in lawful possession of said mine, to pursue the operation of same with due diligence, and, if they (the plaintiffs) failed, neglected, and refused to pursue the operation of said mine with due diligence, then, as a matter of law, the defendant had the right to enter upon the said premises, take charge of and evict the plaintiffs therefrom, and the defendant, under such circumstances, could not be held to account for damages for such eviction. However, the mere temporary cessation of operation of said mine with the consent, if any, of the superintendent of the defendant company would not justify the defendant in taking charge of said mine and evicting the plaintiffs therefrom."

By interrogatory No. 1, set out above, the jury found directly upon the proposition that the plaintiffs were wrongfully evicted from the mine in question. That finding was also approved by the trial court, and we are not disposed to disturb it. This brings us to the third proposition, which we find much more difficult, and it relates to the sufficiency of the evidence to sustain the judgment.

Plaintiffs' right of recovery is dependant upon the loss of anticipated profits which they allege they would have made in the operation of a coal mine if they had not been evicted therefrom, and thereby prevented from carrying on said business.

Before proceeding further, we deem it proper to call attention to the general rule that anticipated profits

of a future business are so dependent upon numerous and uncertain contingencies that their amount is seldom susceptible of proof, with any reasonable degree of certainty, and they are too remote, speculative and uncertain to sustain a judgment for the loss thereof. We say this is the general rule. Of course, there is an exception to this general rule, which is that the loss of profits from the destruction or interruption of an established business may be recovered where it is made reasonably certain by competent proof what the amount of the loss actually is; and such damages must be established, not by guesswork, conjectures, uncertain estimates, or mere conclusions, but by tangible facts, from which actual damages may be logically and legally shown or inferred. What do we find to be the result in this case, when measured by these rules? For the purpose of proving loss of anticipated profits, the plaintiffs attempted to prove the profits of the business prior to eviction, which was about December 15, 1912, and to establish such profits plaintiff Bray testified, in part, as follows:

"Q. Going back to the question I asked you a while ago, in the ordinary operation of that mine, how many tons of coal per month ordinarily could and did you produce from that mine? A. You want me to tell about the average production of the mine? Q. Yes; with the mine in the condition it was on the 15th of December, 1912. A. We produced, after we got to running and the new boiler installed and started up, in the first half of December—that was practically the only full half month that we run—we produced 800 tons, but that would not have been a normal production. Q. Do you mean that is more than ordinary, or less than ordinary? A. It was less than ordinary, for the reason that some of the places were not cleaned out, for the reason that

we had been shut down so long, and the water had gotten in. Q. When did your right to operate that mine expire, Mr. Bray? A. The contract expired on the 5th of August, 1913. Q. From your knowledge of the condition of the mine on the 15th of December, 1912, and from your connection with the mine, what would reasonably have been the profits of the operation of that mine from the 15th of December, 1912, until the expiration of this contract, the 6th day of August, 1913? * * * Q. During the time that you were in the operation of that mine, what was the result of its operation when it was in ordinary condition? A. The average output during the entire period of time we had had it had been in the neighborhood of 2,000 tons a month. That would not have been— The output would have been more than that, could the mines have run every day, but coal mines never run every day. Q. What were your ordinary profits per ton on coal mined from the mine? A. It would vary from 15 cents to 35 cents a ton on the coal that was shipped, and about 75 or 80 cents on the coal that was sold locally, a ton—coal that was sold for domestic purposes. Q. You say you operated that mine for over four years? A. Yes, sir. Q. Do you know what the profits you made out of the mine were? * * * Q. I want you to state, Mr. Bray, whether you made a profit from the operation of that mine during the year. A. Yes, sir. Q. What was the average monthly profit of the mine, judged by the time you were in operation there, taking it one year with another? Witness: That would be the average for the entire period we operated. When the mine was small when we first took it? Q. No; I said during the time that the mine was in approximately the same condition that it was on December 15, 1912. Witness: A. The average monthly profit of the mine when it was in the condition it was on December 15, 1912, would have been $400 a month. The average monthly profits for the entire time we run the mine, from November, 1909, to December, 1912, for the four years the average

monthly profit was $1,500 a year. Q. What was the average profit during the .year 1912, the last year the mine was in operation? A. The profit for the year 1912, with the exception of the month of November, when we was shut down, was $300 a month, with the exception of November, when we was shut down. Q. Now, Mr. Bray, taking the mine in the condition in which it was on the 15th of December, 1912, what would probably have been the profits of that mine for the next eight months? * * * Q. You say that during the year 1912 you made an average profit, with the exception of the month of November, of $300 a month? A. Yes, sir. Q. How much did you make, how much profit did you make, if you remember, during the month of January, 1912? A. I couldn't state the exact dollars and cents. Q. How do you know you made $300 a month during that year? A. Because every month I would figure the profits, and for the ten months of 1912 I figured the total profits. Q. Where did you get the data from which you figured the profits? A. Our books show the amount of stuff that we had bought and put into the place, where the money had went to, where all the payments were made, and the amounts we had used personally. Q. You got that from your books? A. My records. Q. Where are those records? A. The most complete record I had was a statement rendered me by the Bokoshe Smokeless Coal Company. Q. Do you claim that these statements rendered you from month to month by the Smokeless Coal Company show any such profits? A. The statements didn't show any profits; no. Q. The statements simply show your standing with the Bokoshe Smokeless Coal Company? A. That is all. Q. The statement does show that you were getting behind with them on part of that time? A. I don't think so. Q. You didn't figure your profits from those statements rendered you? A. Those statements were treated the same as invoices for any other supplies. Q. You didn't figure profits, average profits, of $300 from those statements? A. Partially from those state-

ments.    Q. I thought you said they didn't show any
profit or loss.    A. I must have some basis to figure
profits on.    Q. If you used these statements in figuring
those profits, what else did you use?    A. I used these
elements.    I used the pay roll sheets and invoices of
stuff we had bought from other people—remittances for
shipments of coal.    Q. Where is that data?    A. It was
kept in a loose leaf form, and I haven't that now; it
has been lost.    Q. So your testimony here is guesswork
practically, from your recollection?    A. It is no more
recollection than it would be to remember that the
sun was shining.    Q. Then why can't you tell me how
much profit you made during the month of January,
1912?    A. Because it wasn't necessary for me to re-
member that.    Q. How much did you make in February,
1912?    A. Same answer to that.    Q. You don't know
the amount of profits you made any single month during
the year 1912?    A. No, sir.    Q. But you are willing to
testify to this jury that your average profits were $300
a month?    A. Yes, sir.    Q. When did you figure on
those profits?    A. On the 1st of every month, or right
after the 1st.    Q. What kind of a record did you keep
when you put down the amount of profits?    A. I had
a loose leaf set of books.    Q. When did you lose those
books?    A. Frankly, the books are packed; are on the
way from Memphis; part of them haven't come yet.    Q.
So you really have this data?    A. I have part of it.
Q. What have you?    A. I have the books showing the
total production of the mines for the year 1912.    Q. Any-
thing else?    A. I am not sure; I think I have part of the
ledger or all of the ledger.    Q. What does it show?    A. It
shows a profit.    Q. What did you keep on the ledger?
A. Keep the profits.    Q. Keep anything else?    A. Yes.
Q. What is the ledger used for?    A. The ledger is used
chiefly to figure up profit and loss.    Q. You needed about
all your books to figure up your profits?    A. Yes, sir.    Q.
When was it that you had to give a bond to insure this
pay roll to the miner's union?    A. I think that was in
June, 1912, some time during the summer time, right after

the settlement of the suspension. Q. Did you have money on deposit to take care of the pay roll at the time you were required to give bond? A. It is impossible to answer that question. Q. You don't know whether you made any money during the month of June, 1912, or not? A. The question asked me a while ago was, 'What was the average?' I don't know. We might have lost. Q. Do you know whether or not you made or lost money during the month of June, 1912? A. I don't know. Q. How about July? A. I don't know whether we lost or gained. Q. Do you know the amount of your production during the month of July, 1912? A. I do not. Q. Can you give any approximate estimate of it? A. I cannot. Q. Do you know the amount of your production for August, 1912? A. I do not. Q. Can you give an approximate of it? A. Neither for July, August, September, or October. Q. Can you state the total amount of your production during the year 1912, up to and including the 15th day of December, 1912? A. I cannot. Q. Can you give an approximate estimate of it? A. I cannot. Q. Of the total production? A. I could not. Q. Now, Mr. Bray, do you undertake to tell this court and jury that you know that you made $500 average profits a month, when you can't even estimate the total production in tons that you made that year? A. I never made that statement that we made $500 a month. I said $300. Q. Your estimate for the next year was $500? A. Yes, sir. Q. Do you undertake to tell the court and jury that you made $300 a month, when you don't know now, and can't even approximately estimate, the total number of tons that were produced from your mine? A. Yes, sir. Q. You had to make the profits on so many tons at so much per ton? A. Yes, sir. Q. You said a while ago that you made 25 cents a ton. A. On some of it; yes. Q. How can you tell how much profits you made if you don't know the number of tons you produced? A. I think I answered that. Every month I figured up how much profit we made, regardless of how many tons we produced. It wouldn't be necessary to prove the number of tons. Q. You didn't invoice the first

of 1913, did you? A. No, sir; I did not. Q. How many tons of coal, in your judgment, did you produce those first ten months of that year? A. I couldn't state. Q. Can you state within any reasonable approximation of it? A. No; I could not. Q. You have stated that your profits had to be based on so much per ton. What did you say the average profit per ton was? A. About 25 cents. Q. In order for you to know if that answer is correct—how much profit you made on the whole ten months—you would have to know the number of tons you produced during that ten months, wouldn't you? A. Yes, sir."

It must be apparent that this testimony falls far short of coming up to the requirements of the rules above mentioned. Plaintiff Bray testified, generally, that there had been a profit in the business—a mere conclusion. He stated that there was a profit of from 15 to 35 cents a ton on the coal sold. He could not give the number of tons sold or even an approximation of it. He did not pretend to know of the cost of mining or producing the coal, the amount of capital invested, or any other data or item upon which the court or jury could start to make an estimate of the profits or losses of the business; and, except for the single fact that plaintiff testified to the conclusion that there had been a profit, the court could not possibly tell from the testimony whether there had been a profit or loss in the business. This class of testimony, under all the authorities, is too general, indefinite, and uncertain to sustain a judgment.

Having a very similar question before it, the Circuit Court of Appeals of this circuit in *Central Coal & Coke Co. v. Hartman,* 111 Fed. 96, 49 C. C. A. 244, in paragraphs 1, 2, 3, 4, and 5 of the syllabus, say:

"Only actual damages, established by the proof of facts from which they may be rationally inferred with

reasonable certainty, are recoverable. Speculative, remote, or contingent damages cannot form the basis of a lawful judgment.

"The estimates, speculations, or conjectures of witnesses unfounded in the knowledge of actual facts from which the amount of the damages could have been inferred with reasonable certainty will no more sustain a judgment than the conjectures of a jury.

"The general rule is that the anticipated profits of a commercial business are too remote, speculative, and dependent upon changing circumstances to warrant a judgment for their loss. There is an exception to this rule, that the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his actual loss was.

"Proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption charged, or of facts of equivalent import, is indispensable to a lawful judgment for damages for the loss of the anticipated profits of an established business.

"The plaintiff testified that the acts of the defendants had greatly diminished his business, prevented him from making contracts for future delivery of coal, and diminished his sales from 15 to 20 carloads per month, on which he would have made a profit of from $12 to $20 per car, that he could not tell what the volume of his business was before or after the acts complained of, and that he had no books or papers which would show this fact. He produced no evidence of the expenses or income of his business before or after the acts complained of. *Held,* that the evidence was insufficient to sustain a verdict for damages for the loss of anticipated profits."

That case is so entirely in line with the facts in this case, and so clearly in point herein, that even at the risk of being tedious we are tempted to quote liberally from the body of the case as follows:

"The only damages claimed in the petition, and the only losses which the plaintiff sought to prove at the trial, were the loss of some of the expected profits of his business of buying and selling coal between January 1, 1897, and January 25, 1899. Compensations for the legal injury is the measure of recoverable damages. Actual damages only may be secured. Those that are speculative, remote, uncertain, may not form the basis of a lawful judgment. The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages. Now, the anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their amount is not susceptible of proof with any reasonable degree of certainty; hence the general rule that the expected profits of a commercial business are too remote, speculative, and uncertain to warrant a judgment for their loss. *Howard v. Manufacturing Co.*, 139 U. S. 199, 206, 11 Sup. Ct. 500, 35 L. Ed. 147; *Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co.*, 152 U. S. 200, 205, 14 Sup. Ct. 523, 38 L. Ed. 411; *Trust Co. v. Clark*, 92 Fed. 293, 296, 298, 34 C. C. A. 354, 357, 359; *Simmer v. City of St. Paul*, 23 Minn. 408, 410; *Griffin v. Colver*, 16 N. Y. 489, 491, 69 Am. Dec. 718. There is a notable exception to this general rule. It is that the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. The reason for this exception is that the owner of a long-established business gen-

erally has it in his power to prove the amount of capital he has invested, the market rate of interest thereon, the amount of the monthly and yearly expenses of operating his business, and the monthly and yearly income he derives from it for a long time before and for the time during the interruption of which he complains. The interest upon his capital and the expenses of his business deducted from its income for a few months or years prior to the interruption produce the customary monthly or yearly net profits of the business during that time, and form a rational basis from which the jury may lawfully infer what these profits would have been during the interruption if it had not been inflicted. The interest on the capital and the expenses deducted from the income during the interruption show what the income actually was during this time; and this actual net income, compared with that which the jury infers from the data to which reference has been made the net income would have been if there had been no interruption, forms a basis for a reasonably certain estimate of the amount of the profits which the plaintiff has lost. * * *

"The truth is that proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption charged, or of facts of equivalent import, is indispensable to a lawful judgment for damages for the loss of the anticipated profits of an established business. * * *

"Did the plaintiff make any proof of this character at the trial below? * * * The only evidence he produced as to his expected profits was his own testimony that his ordinary profit on a carload of coal was from $12 to $20, and that he had his own place of business and his own teams. But the evidence disclosed the fact that this $12 to $20 was the difference between the amount he paid for a carload of coal and the amount which he retailed it for, and that it would be necessary to deduct from this alleged profit the proper proportion of the expenses of hiring the teamsters, maintaining the teams and the of-

fice, handling the coal, and operating the business before the actual profit could be ascertained; and there was no evidence of the amount of these expenses. The plaintiff testified that he kept a ledger, in which he entered the charges of coal sold on credit, and that he had a bank account and a bank book, but he said that he had no books that would show how much coal he handled before or after the interruption, and he did not produce either his ledger or his bank book. Here are a few extracts from his testimony on cross-examination: 'Q. Now, you can't give us any details as to the amount your business was damaged, can you? A. Yes; I think I can make an estimate that it was three or four cars a week less during the season. Q. That would be your estimate? A. Yes, sir. Q. But you can't tell these gentlemen how many cars you handled less after that than you did handle while you were a member of the association, or before you were a member? A. Well, it would run between 12 and 15 cars a month. * * * Q. And you can't tell the jury the number of cars of coal that you handled in 1898? A. No, sir. Q. All that you can say is that you think it is a little less than it was in the year 1896? A. Yes, sir. Q. But how much less, you can't tell? A. No, sir. * * *'

"These excerpts from the testimony demonstrate the fact that the basis of this judgment is nothing but the mere guess of an interested witness. Litigants cannot be permitted to estimate the money out of the coffers of their opponents in this reckless way. This plaintiff first estimated that he had lost the sale of from nine to thirteen cars of Salt Fork coal per month during the winter season after he withdrew from the club, and the same number of cars of Cherokee coal, or in the aggregate from 18 to 26 cars per month. On cross-examination he guessed again, and estimated that his loss was only from 12 to 15 cars a month. * * *

"These books were not produced. The indispensable facts to warrant a recovery of the expected profits of an established business were not established. There was no

evidence of the amount of capital in the business, or its expenses or of its income, either before or after its interruption. There were no data for a rational estimate of the profits at any time during the continuance of the business; nothing from which the jury could reasonably infer that the business was profitable before, less profitable or profitless after, the plaintiff's withdrawal from the club. Much less were there any facts established which made the amount of the expected profits lost reasonably certain. The interested witness who alone estimated this loss himself testified that he knew no facts from which a rational finding could be made, and his testimony shows that his estimates were nothing but the wildest conjecture. The result is that the verdict is a speculation of the jury, based on the conjectures of an interested witness, unsupported by the proof, or the knowledge of any facts from which the plaintiff's loss, or its amount, could lawfully or rationally be inferred, and it cannot be sustained."

In *Midland Valley R. Co. v. Fulgham*, 181 Fed. 91, 104 C. C. A. 151, the same court again says:

"Conjecture is an unsound and unjust foundation for a verdict. Juries may not legally guess the money or property of one litigant to another. Substantial evidence of the facts which constitute the cause of action * * * is indispensable to the maintenance of a verdict sustaining it."

This court has also adopted the same rule. The case of *Tootle et al. v. Kent et al.,* 12 Okla. 674, 73 Pac. 310, was an action to recover damages for wrongfully closing plaintiff's store. In the seventh headnote we find the following:

"(7) The court permitted the plaintiff to testify as to the amount of damages he sustained to the stock of goods, over the objections of the defendants. This method

of proving damages was erroneous. The witness should have been required to state the facts, and not his conclusions as to the amount of damages sustained."

In *Spaulding Mfg. Co. v. Cooksey*, 34 Okla. 790, 127 Pac. 414, the court says:

"Matters capable of proof should not be left to conjecture. Verdicts and decisions of courts should be based upon evidence, not upon guesswork."

And in *Spaulding Mfg. Co. v. Holiday*, 32 Okla. 823, 124 Pac. 35, it is said:

"Matters capable of proof should not be left to conjecture. Verdicts should be based upon evidence, not upon guesswork, especially concerning things so easily capable of proof. As there was no evidence as to the measure of damages, as prescribed in section 2900, *supra*, the defendant has failed to establish his defense."

The Supreme Court of Nebraska, in *Silurian Mineral Springs Co. v. Kuhn*, 65 Neb. 646, 91 N. W. 508, say:

"Damages in the nature of anticipated profits on conjectured, expected, or hoped-for sales cannot be recovered. Such damages are too speculative, remote, and consequential; they lack the element of certainty necessary to authorize a recovery therefor."

In the case of *Bartow v. Erie R. Co.*, 73 N. J. Law, 12, 62 Atl. 489, the Supreme Court of New Jersey in one paragraph of the syllabus lays down the doctrine as follows:

"Loss of profits in business are recoverable as damages in actions of tort, when they are capable of being estimated with reasonable certainty; but, where the proof furnishes no data from which the jury may find with reasonable certainty the amount of the profits recoverable as damages as the result of the accident, it is error for the court to submit this element of damages to the jury."

And in the body of the opinion the court says:

"There was no proof in the cause which would justify the jury in assessing any damages to the plaintiff for loss of profits. The only testimony given on the subject was that of the plaintiff himself, and that amounted to nothing more than a mere statement that he took in in his business from $1,000 to $1,100 per annum. This was proof only of the gross amount of his business. His books were not produced, nor was there given by him any estimate of the expenses incident to the conducting of his business, or of the proportion of the expenses to the gross income. To justify a finding of loss of profits as a part of the verdict in a cause, the proof must be such as will show the jury with reasonable certainty what the profits alleged to have been lost would have been but for the injury to the plaintiff. Profits must be proved. They cannot be estimated by the jury without data to justify their finding. *East Jersey Water Co. v. Bigelow,* 60 N. J. Law, 201, 38 Atl. 631. There being no proof of loss of profits in the business of the plaintiff which the jury could, under the proof, arrive at with reasonable certainty, it was error for the trial judge to submit the question of this class of damages to the jury, and he should have charged as requested.

"For this error, and this alone, the judgment is reversed."

In this case, for the purpose of fixing his damage for loss of anticipated profits, one of the plaintiffs testified in a general, conjectural way that his profits during a certain prior period had been a certain amount, expecting the jury to judge the future by the past. That was the very question to be submitted to the jury, and, if the testimony of the witness in that particular should be accepted by the court and jury, it would result in a complete determination of the case, but it would be simply the guesses, conjectures, and speculations of the witness,

without any data or facts from which a reasonably correct estimate could be made.

If the plaintiffs base their profits on 15 to 35 cents a ton for the amount of coal mined, and cannot even approximate the number of tons produced, how can they ask or expect the court or jury to find, or even guess at, the amount of profits, and especially without any data or estimate of the expense of operation? It is impossible.

From all these considerations we are forced to the conclusion that there was no competent evidence whatever to sustain the findings and verdict of the jury, and the judgment should be reversed, and the case remanded to the district court of Le Flore county for new trial.

By the Court: It is so ordered.