2010 OK CIV APP 48

Michael W. LIPPITT, Plaintiff/Appellee,

v.

FARMERS INSURANCE EXCHANGE, Truck Insurance Exchange, Fire Insurance Exchange, Mid–Century Insurance Company, Farmers New World Life Insurance Company And Farmers Insurance Company, Defendants/Appellants.

No. 106,229.

Court of Civil Appeals of Oklahoma, Division No. 2.

Oct. 2, 2009.

Rehearing Denied Nov. 17, 2009.

Certiorari Denied April 19, 2010.

James P. McCann, Jon E. Brightmire, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, OK, for Plaintiff/Appellee.

Randall J. Snapp, Brooke S. Murphy, Amanda L. Maxfield Green, Crowe & Dunlevy, Tulsa and Oklahoma City, OK, for Defendants/Appellants.

DEBORAH B. BARNES, Presiding Judge.

¶ 1 Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid–Century Insurance Company, and Farmers New World Life Insurance Company (collectively, Farmers)[1] appeal the September 22, 2008 Order Granting Preliminary Injunction preventing Farmers from terminating its contract with Michael W. Lippitt (Lippitt) while the case proceeds on the merits.

---

1. Farmers, as used herein, does not include Farmers Insurance Company because no such entity was a signatory to the contract at issue, and no entity exists with that precise name. Appellants' Brief-in-Chief, nt. 1; Pl.'s Exh. 14; Transcript (Tr.), at 18.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Prior to entering into the contract at issue in this case, Lippitt was an insurance agent for Farmers. After a few years of sales, Farmers approached Lippitt about becoming a district manager. In September of 1966, Lippitt and Farmers entered into a District Manager's Appointment Agreement for Farmers District 08–04, a district composed of a number of rural counties in Northeast Oklahoma. In July of 1967, Lippitt and Farmers entered into a second District Manager's Appointment Agreement (the DMAA) for the same area. The DMAA superseded the 1966 agreement and is the contract at issue in this case. Lippitt's relationship with Farmers under the DMAA has been maintained for over 40 years.

¶ 3 On January 17, 2008, Gregor Scott, the Oklahoma State Executive Director of Farmers (Scott), met with Lippitt regarding his recent performance and offered Lippitt the opportunity to retire. When Lippitt declined, Scott provided him with a prepared letter dated January 17, 2008. This letter stated that the DMAA would terminate in thirty days, on February 18, 2008, "in accordance with Paragraph D" of the DMAA. Paragraph D provides that "[t]his Agreement ... may be cancelled without cause by either [Lippitt] or [Farmers] on 30 days written notice...."

¶ 4 On February 14, 2008, Lippitt filed a Petition in Tulsa County District Court naming Farmers as the defendant. The Petition states a claim for breach of contract and seeks temporary, preliminary and permanent injunctions to prevent Farmers' termination of the DMAA. Along with the Petition, Lippitt filed an Application for Temporary Restraining Order and Preliminary Injunction. In a Minute Order filed on February 21, 2008, the trial court granted Lippitt's Application for Temporary Restraining Order to prevent termination of the DMAA until the trial court could decide the issue of whether a preliminary injunction should be granted.

¶ 5 On April 4, 2008, the trial court heard arguments and evidence, including testimony, on Lippitt's Application for Preliminary Injunction. At the close of this hearing, the trial court ordered the parties to file post-hearing briefs. On July 29, 2008, the trial court filed its Order Granting Plaintiff's Motion for Preliminary Injunction to prevent Farmers' termination of the DMAA while the case proceeds on the merits. On September 22, 2008, the July 29, 2008 Order was converted, without any substantive changes, into the Order Granting Preliminary Injunction, which states, in part:

> The Court finds that the uniqueness of [Lippitt's] contract and the speculative nature of the potential damages as a result of [Lippitt's] 40 year history in the District, as well as marketplace uncertainties and other factors discussed at trial warrant granting injunctive relief.

From this Order Farmers appeals.

## STANDARD OF REVIEW

¶ 6 An injunction is an "extraordinary remedy, and relief by this means is not to be lightly granted." *Amoco Production Co. v. Lindley*, 1980 OK 6, ¶ 50, 609 P.2d 733, 745. The applicant must show entitlement to injunctive relief by clear and convincing evidence. *CoxCom, Inc. v. Oklahoma Secondary Schools Athletic Association*, 2006 OK CIV APP 107, 143 P.3d 525. "The standard of review imposed for the issuance of a temporary injunction is whether the trial court abused its discretion or entered a decision against the evidence." *Brown v. Oklahoma Secondary School Activities Association*, 2005 OK 88, ¶ 11, 125 P.3d 1219, 1225. (Footnote omitted.) In reviewing the decision, the appellate court will consider and weigh the evidence presented to the district court. *Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association*, 1977 OK 17, ¶ 3, 561 P.2d 499, 502.

## ANALYSIS

¶ 7 Title 12 § O.S.2001 1382 states, in pertinent part, that a temporary injunction is warranted:

> When it appears, by the petition, that the plaintiff is entitled to the relief demanded, and such relief, or any part thereof, consists in restraining the commission or continuance of some act, the commission

or continuance of which, during the litigation, would produce injury to the plaintiff; or when, during the litigation, it appears that the defendant is doing, or threatens, or is about to do or is procuring or suffering to be done, some act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual, a temporary injunction may be granted to restrain such act.

Oklahoma courts consider four criteria in determining whether to grant a temporary injunction: "(1) the applicant's likelihood of success on the merits, (2) irreparable harm to the party seeking relief if injunctive relief is denied, (3) the relative effect on the interested parties, and (4) public policy concerns arising out of the issuance of injunctive relief." *CoxCom, Inc.*, at ¶ 10, 143 P.3d at 528. (Citation omitted.) Courts focus most heavily upon the irreparable harm requirement. *Id.*[2]

■ ¶ 8 Lippitt argues that he will suffer irreparable harm if a preliminary injunction is not granted. "[I]njury ... is irreparable when it is incapable of being fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages." *Hines v. Independent School District No. 50, Grant County, Oklahoma*, 1963 OK 85, ¶ 14, 380 P.2d 943, 946. (Citations omitted.) "Damages, to be recoverable, must be susceptible of ascertainment in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard." *Great Western Motor Lines, Inc. v. Cozard*, 1966 OK 134, ¶ 8, 417 P.2d 575, 578. (Citations omitted.) In his Petition, and in his Application for Preliminary Injunction, Lippitt asserts that he would suffer irreparable harm in "various forms" after termination of the DMAA, namely: (1) monetary damages due to lost compensation in the form of commission overrides, (2) damage to

reputation, (3) loss of profession, and (4) loss of efforts and investment in building up his district for over 40 years. Lippitt argues that these damages would be difficult if not impossible to measure and, therefore, the only remedy capable of preventing irreparable harm is an injunction preventing the termination of the DMAA. We disagree and find that the trial court abused its discretion when it found, by clear and convincing evidence, that irreparable harm would result absent the issuance of an injunction.

### (1) *Lost Commission Overrides*

■ ¶ 9 Lippitt's compensation as a district manager consists of commission overrides. These commission overrides, paid to Lippitt by the 25 agents in his district, are generated by (1) renewal premiums on existing policies (renewal premiums), and by (2) premiums on new policies (new policy premiums).

¶ 10 Commission overrides generated by renewal premiums have been found to be a "predictable, quantifiable amount of future income." *Hall v. Farmers Insurance Exchange*, 1985 OK 40, ¶ 25, 713 P.2d 1027, 1031.[3] Renewal premiums are based upon policies that have already been sold, and such policies can be expected to "be renewed at a predictable, quantifiable rate." *Id.* at ¶ 22. Furthermore, as shown below, there exist sufficient tangible facts in the record from which Lippitt's damages—based upon both renewal premiums and new policy premiums—can be ascertained in a manner other than by mere speculation, conjecture or surmise. *Great Western Motor Lines, Inc.*, 1966 OK 134, 417 P.2d 575. To the extent that Lippitt's compensation as district manager under the DMAA stems from renewal premiums, we find that such amounts, although subject to some uncertainty, would not be too speculative or impossible to calculate. In regard to renewal premiums, termi-

---

2. "Irreparable injury is the sine qua non for the grant of preliminary relief." *Williams Exploration Co. v. U.S. Department of Energy*, 561 F.Supp. 465, 469 (N.D.Okla.1980). "The harm to be occasioned in absence of an injunction must be irreparable to the Plaintiff." *Amoco Production Co.*, at ¶ 53, 609 P.2d at 746.

3. "In *Hall*, we held ... that damages based upon the value of future renewal commissions were proper." *Bigbie v. Bigbie*, 1995 OK 72, ¶ 10, 898 P.2d 1271, 1273.

nation of the DMAA would not result in irreparable harm.

¶ 11 Lippitt argues that, unlike renewal premiums, his compensation based upon new policy premiums is subject to "the independent and unpredictable performance" of the 25 agents in his district. Damages based upon new policy premiums are, in addition, subject to unforeseeable marketplace fluctuations. Therefore, Lippitt argues, his damages based upon new policy premiums are too difficult or impossible to calculate and, absent an injunction, would result in irreparable harm.

¶ 12 Damages based upon loss of commission overrides for new policy premiums are analogous to loss of future profits addressed by the Oklahoma Supreme Court in *Bokoshe Smokeless Coal Co. v. Bray*, 1916 OK 111, 55 Okla. 446, 155 P. 226. In *Bokoshe*, the Oklahoma Supreme Court articulated "the general rule that anticipated profits of a future business are so dependent upon numerous and uncertain contingencies that their amount is seldom susceptible of proof, with any reasonable degree of certainty, and are too remote, speculative, and uncertain to sustain a judgment for the loss thereof." *Id.* at ¶ 8, 155 P. at 229. In other words, anticipated profits of a commercial business or other like business, are ordinarily too speculative to warrant recovery for their loss. However, "there is an exception to this general rule, which is that the loss of profits ... of an established business, may be recovered where it is made reasonably certain by competent proof what the amount of the loss actually is; and such damages must be established, not by guesswork, conjectures, uncertain estimates, nor mere conclusions, but by tangible facts, from which actual damages may be logically and legally shown or inferred." *Id.* In other words, anticipated profits from an established business may be recovered where the amount of loss can be shown with reasonable certainty and/or by just and reasonable inference. *Id.; Florafax International, Inc. v. GTE Market Re-*

*sources, Inc.*, 1997 OK 7, 933 P.2d 282. The Oklahoma Supreme Court has stated that:

It is a matter of common knowledge and experience that persons who have an established business calculate with reasonable certainty the income derived and to be derived from their business and make their plans to live accordingly. In fact, the credit structure of the country rests largely upon the certainty of income from established business in all lines of business and industry, and certainly the value of an established business is not such a matter of speculation, nor the prospect of profits therefrom so remote, as not to form a basis for recovery of damages for injury to it . . . .

*Firestone Tire & Rubber Co. v. Sheets*, 1936 OK 523, ¶ 9, 178 Okla. 191, 62 P.2d 91, 93.

¶ 13 Lippitt's district is an established one: it has existed under Lippitt's management for over 40 years and has the second highest number of policies in Oklahoma. Lippitt's agents, numbering around 25, are a "dedicated" and, in part, multigenerational workforce. As stated by Lippitt, "[I'm] very proud of the agents within my district. They're dedicated. . . . That's why we have an old culture, an old tenure. I have eight second-generation agents in my district, one third generation."[4] Lippitt's anticipated compensation as a district manager from new policy premiums under the DMAA is analogous to anticipated profits from an established business, and there are tangible facts from which a damages amount can be calculated with reasonable certainty.

¶ 14 These tangible facts include the following: on at least two occasions Lippitt communicated to Scott his intention of completing 50 years of service before retiring.[5] Lippitt completed 45 years of service on February 28, 2008, and his damages could readily be calculated until five years from this date. In fact, Lippitt's own counsel stated that Lippitt "planned to work another five years."[6] Lippitt's counsel stated that Lippitt's "commissions and overrides which he receives on an annual basis are something on

---

4. Tr., at 148–49.

5. Record (R.), 5, 6, 130.

6. Tr., at 104

the order of $600,000 a year...."[7] Lippitt also testified to the fact that he was making approximately $600,000 a year in gross commission overrides from Farmers.[8] According to Lippitt's "YTD Commission Statement," Lippitt has made the following amounts in total commission overrides (renewal premiums plus new policy premiums) from 2003 through 2007: $574,021.22 in 2003, $591,162.61 in 2004, $597,413.98 in 2005, $577,964.42 in 2006, and $565,672.66 in 2007, with an average of $581,246.98.[9] During this time, Lippitt's salary never fluctuated more than three percent from the five-year average.[10] As stated by Lippitt's own counsel, in "five more years ... [it] would be about a three-million dollar income over that period of time...."[11]

¶ 15 Although Lippitt's compensation that stems from new policy premiums may be dependent upon numerous and uncertain contingencies, such as the independent and unpredictable future sales of the agents in his district, Lippitt's district is an established one and there exist sufficient tangible facts from which a reasonable calculation of damages can be made. In regard to new policy premiums, termination of the DMAA would not result in irreparable harm.

¶ 16 In regard to lost commission overrides in general, we find that, in the event Lippitt is successful at trial, his damages are "susceptible of ascertainment in some manner other than by mere speculation, conjecture or surmise, and by reference to some definite standard." *Great Western Motor Lines, Inc.*, at ¶ 8, 417 P.2d at 578. (Citations omitted.) Therefore, the trial court abused its discretion when it found, by clear and convincing evidence, that the irreparable harm requirement was satisfied for purposes of granting a preliminary injunction.

### (2) *Damage to Reputation*

¶ 17 Triers of fact are capable of calculating damages for injury to reputation. *See Harolds Stores, Inc. v. Dillard Department Stores, Inc.*, 82 F.3d 1533 (10th Cir. 1996). Furthermore, an injunction is an extraordinary remedy that will not be lightly granted, especially when a legal remedy is available. *Amoco Production Co.*, at ¶ 50, 609 P.2d at 745. We find that, in the event Lippitt succeeds on the merits at trial, any damage to his reputation, if supported by competent evidence, can be reasonably calculated into money damages.[12] Failure to grant a preliminary injunction would not result in irreparable harm to Lippitt's reputation.

### (3) *Loss of Profession*

¶ 18 Lippitt's damage claim for loss of profession can be adequately compensated, in the event he succeeds at trial, by awarding Lippitt the loss of commission overrides in the manner described above. We find that any damage caused by the loss of his profession is compensable and will not result in irreparable harm to Lippitt.

### (4) *Loss of Efforts and Investment in Building District*

¶ 19 In the event that he succeeds at trial, Lippitt claims that it would be too speculative to quantify damages attributable to the loss of over 40 years of personal efforts and investments in his district. However, Lippitt has already been compensated for his efforts and investments. Under the DMAA, Lippitt has been compensated for his work as the district manager by commission overrides "on all business produced by agents of, and written by [Farmers] in the

---

7. Tr., at 105–106. The Petition itself, filed by Lippitt on February 14, 2008, around five years prior to what would be 50 years of service, reflects the calculability of damages based upon this five-year measure. The Petition seeks damages "in an amount difficult to determine but believed to be in excess of $3,000,000.00," reflecting Lippitt's reasonably consistent salary of $600,000 per year for five more years.

8. Tr., at 208.

9. R., at 164–166.

10. R., at 166.

11. Tr., at 106.

12. Lippitt does not argue otherwise in his brief and states instead that, "Damage to reputation ... [is] not necessarily sufficient evidence of irreparable harm...." Appellee's Answer Brief, p. 23, nt. 9.

District." [13] The following exchange took place at the hearing on the preliminary injunction:

> [Farmers' counsel:] ... [Y]ou've been paid your commission override for the production within your district, correct?
>
> [Lippitt:] And Farmers has made a wonderful profit of all the years, yes.
>
> [Farmers' counsel:] And you have too?
>
> [Lippitt:] Yes. It's a two-way street.[14]

¶ 20 To the extent that any efforts to motivate the agents in his district, or to grow or maintain the number of policies in force in his district, have been successful, Lippitt has already reaped the benefits of those efforts and investments. In fact, Lippitt's compensation under the DMAA averaged $581,246.98 per year over the most recent five years. In the event that Lippitt succeeds at trial, we find that termination of the DMAA will not result in irreparable loss of the efforts and investment Lippitt has placed in his district over the years because he has already been compensated.

¶ 21 If the injury may be compensated by an award of monetary damages then an adequate remedy at law exists and no irreparable harm may be found as a matter of law. *CoxCom, Inc. v. Oklahoma Secondary Schools Athletic Association*, 2006 OK CIV APP 107, 143 P.3d 525.[15] We find that Lippitt has an adequate remedy at law, and the trial court abused its discretion when it found, by clear and convincing evidence, that irreparable harm would result from termination of the DMAA in the event Lippitt succeeded at trial.

## CONCLUSION

¶ 22 "[A]ll four criteria ... must be met before a temporary injunction is issued [and] courts tend to focus most heavily upon the 'irreparable harm' requirement." *CoxCom, Inc.*, at ¶ 11, 143 P.3d at 528. (Citation omitted.) Lippitt has not demonstrated ir-

reparable harm by clear and convincing evidence. Instead, the evidence indicates that any harm to Lippitt can be adequately compensated with money damages. Having found that Lippitt did not demonstrate irreparable harm, it is unnecessary for this Court to determine whether Lippitt met the other criteria for issuance of a preliminary injunction. *See Id.* at ¶ 17.

¶ 23 For the reasons set forth, we find that the trial court abused its discretion by granting a preliminary injunction.

¶ 24 **REVERSED.**

WISEMAN, V.C.J., and GOODMAN, J., concur.

---

13. Pl.'s Ex. 18.

14. Tr., at 232.

15. In *CoxCom, Inc.*, the Oklahoma Court of Civil Appeals found that, because the applicant for the injunction did not demonstrate irreparable harm, a preliminary injunction should not be granted. Because this criteria was not met, the Oklahoma Court of Civil Appeals found that it was unnecessary to determine whether the other criteria for the issuance of a preliminary injunction were satisfied.