NOBLE HOMES, INC., a Corporation,
Plaintiff in Error,

v.

Jack R. KALMAN, d. b. a. Kalman Engineering, Defendant in Error.

No. 41304.

Supreme Court of Oklahoma.

April 18, 1967.

Harry G. Foreman, Norman, for plaintiff in error.

Benjamin E. Stockwell, Norman, for defendant in error.

BLACKBIRD, Justice.

This appeal involves an action by defendant in error, hereinafter referred to as "plaintiff", against plaintiff in error, hereinafter referred to as "defendant", to recover more than $20,000.00 allegedly due him for engineering services rendered said defendant in connection with the latter's development of a new residential addition to the Town of Noble, Oklahoma.

Both plaintiff and defendant have their headquarters at Norman. Their relationship commenced early in January, 1963, when plaintiff, at the request of one of its officers, came to defendant's Norman office, and conferred with its officers and directors (who apparently had had no experience in such matters) about creating such an addition out of the tract of land they proposed to purchase with the proceeds of a loan to be secured by a mortgage on the realty.

One subject, about which defendant's officials were interested in obtaining information from plaintiff (who had had experience in such matters) was the length of time it would take to get F.H.A. approval of such an addition. In his conference with defendant's officials, plaintiff, according to one witness, assured them "there would be no problem" in completing the preliminary engineering on the tract necessary to obtain its approval as a situs for F.H.A. financed, or guaranteed, home loans by the time "good building weather" arrived in May of that year. Defendant's officials let plaintiff know

that it was "important" that the F.H.A. approval be obtained by that time of year, so that the summer months could be used for the construction of homes in the new Addition.

Thereafter, pursuant to the conversations at the above described conference, plaintiff submitted to defendant a proposal in the form of a letter dated January 10th, 1963, containing a rather detailed schedule of fees, on the basis of which he would undertake the various phases of work, therein referred to.

As set forth in this letter, part of the total fee for plaintiff's work was to consist of "Six percent of all construction contracts, sewer, water, streets-grading and paving, and earth work, for which we present plans, specifications and general supervision." That part of the submitted proposal specifying the manner in which plaintiff's fee was to become payable, recited that after plaintiff had presented the overall preliminary plat of the Addition (including a contour map " * * * for your study and for FHA") and it had been concurred in by the developers and the F.H.A., plaintiff would "be paid an advance of $1500.00", and he would "then prepare preliminaries of each smaller tract within the overall layout, in accordance to the requirements of the developers." Three of the "preliminaries" named in the proposal were: A contour map to be submitted to the Town of Noble for approval, a preliminary plat to conform to the plan approved by FHA, and "preliminary estimates of costs of development as required." Another part of plaintiff's proposal read, in material part, as follows:

"4. We will prepare all construction plans and specifications, receive and analyze competitive bids with the owners and recommend to the owners as to the award of contracts as follows:

&ast; &ast; &ast; &ast; &ast; &ast;

"b. Paving plans and storm sewer plans for approval of the Town of Noble, Oklahoma.

&ast; &ast; &ast; &ast; &ast; &ast;

"d. Setting construction stakes and providing general supervision and inspection of all sewer, water, and paving construction to assure accurate construction of utilities. *(This does not include detail supervision of inspection and if required by developer, shall be paid for at per diem rates set out.)*

&ast; &ast; &ast; &ast; &ast; &ast;

"f. Setting stakes and providing general supervision of grading of streets and of subdivision.

&ast; &ast; &ast; &ast; &ast; &ast;

"5. Setting of iron pins at all lot and block corners; Lots to be staked in groups of five to ten as requested.

"For this service we shall be paid $5.00 per lot."

The above described proposal was accepted, or "approved", by defendant on January 25, 1963.

A few days before, defendant's officials had acquired the land for the proposed addition; it was given the name of the "Cedar Terrace Estates" Addition (to the Town of Noble); and thereafter plaintiff began the engineering work contemplated in the above described proposal and agreement.

On May 29, 1963, plaintiff forwarded to defendants its statement in the amount of $1500.00 for "Preliminary Contouring" and "Preliminary Layout" of the Addition, and "Preliminary Approval of First Section". By its check, dated June 25, 1964, defendant made a payment of $750.00 to be applied on that $1500.00.

A few days previously, or on June 17, 1963, the Bud Harris Construction Company, which had been awarded the job of excavating for the Addition's streets (preliminary to the paving of them) was paid for its work.

After some delays, apparently caused, in part, by unanticipated revisions and modifications of plans to meet suggestions and/or

requirements of the F.H.A. Office, the plat of the new Addition was filed of record on August 14, 1963; and, a few days thereafter, defendant received a letter dated August 22, 1963, from F.H.A.'s State Director, Mr. Bell, notifying it that F.H.A. was then "in a position to accept applications for F.H.A. mortgage insurance on individual properties * * *" in the Cedar Terrace Estates Addition.

Prior to that, however, at least one of defendant's officers had become dissatisfied with plaintiff's work, and thereafter, on August 30, 1963, defendant's president, Mr. Flow, wrote plaintiff, among other things, that his services "are no longer required * * *". In a later letter, dated September 5, 1963, from Mr. Flow, plaintiff was tendered $1,000.00 (in addition to the $750.00 already paid him) "in full and final settlement of all sums due you under your contract * * *". Apparently, plaintiff did not accede to or accept the tendered settlement.

A few days later, defendant employed another engineering firm, Donald G. Clark & Associates. According to Mr. Clark's testimony, some of the excavation work for the Addition's streets had already been done at that time, and his firm was employed "to revise the grade line and supervise" construction on the balance of the streets. It was Mr. Clark's opinion that some of the excavations for the Addition's streets, particularly at, and in the vicinity of, the corner of Fifth Street and Redwood Drive, were so deep and so much lower than the ground around them, that driveways anticipated to be built later from these streets to future homes built on that ground, would have to be too steep to be practical and desirable. Instead of decreasing this difference in elevations merely by scraping dirt off of those lots to lower their surface, defendant, upon Clark's recommendation, again engaged the Bud Harris Construction Company, which raised the elevation of these street excavations by partially filling them with dirt, which had to be compacted as it was spread. The cost to de-

fendant of this refilling and compacting work, and of the density and compaction tests, contemplated as necessary to meet F.H.A. requirements, totalled $873.58.

Thereafter, in December, 1963, plaintiff commenced the present action and alleged, in his amended petition, that, before his services were wrongfully terminated on September 5th, he had done all of the work required by the contract to be done by that date, and that ever since, he had been ready, willing, and able to complete his obligations under the contract, and would have done so, had not defendant denied him this opportunity. The recovery he sought against defendant consisted of the following sums: (1) $3,558.88, less the $750.00 defendant had already paid him as aforesaid, or a net sum of $2,798.88, for "preparation of the preliminary over-all plat and the final plat and for percentages earned to date on the earth work agreement, the sewer agreement, the water agreement, and the street agreement * * *" on the part of the acreage referred to as the Addition's "First Section"; (2) a lesser sum representing his estimate of profits he would have derived *from completion* of the various phases of work on that First Section; and (3) more than $17,000.00 in future profits he allegedly would have earned on the development of the Addition's remaining 160 acres, if defendant had allowed him to complete work on the First Section.

In its answer and cross petition, defendant alleged, in brief substance, that it was justified in terminating plaintiff's services, because of his gross incompetence and negligence, and the delays caused by his inattention to his contract obligations. In substance, defendant denied it was indebted to plaintiff in any sum, in view of the money it had already paid him, and the expenses it had incurred because of his errors and negligence. In said cross petition, defendant further alleged that, on account of plaintiff's "failure to properly oversee, supervise, and inspect the grading of streets * * *" in said Addition, its hereinbefore mentioned Fifth Street and a

portion of its Redwood Drive were "excessively excavated * * *".

In paragraphs I and II of its cross petition, defendant alleged, in substance, that $500.00 of the sums it had paid Bud Harris Construction Company was for this excessive excavation; and it asserted that said sum, in addition to the hereinbefore mentioned total sum of $873.46 (it had spent on raising street elevations) as offsets against the sum of $1344.46 which it admitted plaintiff had earned under the contract. Defendant claimed credit on the latter sum for the $750.00 it had already paid plaintiff, and, in paragraph III of its cross petition, asserted a counterclaim against him totalling $75.48 as expenses it had incurred in connection with installation of an omitted sewer pipe and a water pipe.

In paragraph IV of its cross petition, defendant sought to recover over against plaintiff an item of $2,000.00, which allegedly represented interest for 4 months that had accrued on the one-hundred-and-twenty-thousand-dollar bank loan its officers and their wives obtained about the time they purchased the land on which Cedar Estates Addition was developed. The 4 months was apparently the period of alleged unnecessary delay, between January 9, 1963 (presumably the alleged date of the hereinbefore mentioned initial conference between plaintiff and defendant's officials) and August 22, 1963 (the hereinbefore mentioned date of the F.H.A.'s Director's letter) which defendant claimed plaintiff's errors and neglect of his contract duties caused, in obtaining F.H.A.'s written commitment to accept applications for its mortgage insurance in connection with future home loans in the Addition.

At the trial, after plaintiff had introduced his evidence in chief and rested, defendant demurred to it. The court overruled the demurrer as to plaintiff's alleged cause of action for claimed fees on the Addition's Section One (in the net amount of $2,798.88, as hereinbefore indicated) but sustained it as to "those allegations of future damage, having to do with areas outside of Section One." Subsequently, when defendant had introduced his evidence, and rested, the court sustained a series of special demurrers challenging its entitlement to recover the above described items of damages asserted in its cross petition. After defendant had been allowed exceptions to these rulings, and the court had overruled a general demurrer additionally, interposed by plaintiff, to the evidence, the latter introduced further evidence "in rebuttal." At the close of this "rebuttal", the court overruled defendant's general demurrer, as well as a special demurrer it also interposed to plaintiff's evidence (as a whole) on the ground that it was "contingent, speculative and too remote" to support a judgment "for damages", but neither the reporter's transcript of the proceedings, nor the journal entry of the judgment, approved by both counsel, and later entered after the jury's verdict, reveal that defendant requested, or was granted, any exception to either of the latter rulings.

In thereafter submitting the case to the jury, the trial court, in its instruction "No. 7", limited plaintiff's recovery to $2435.92 as "the maximum amount allowable under the evidence herein", and defendant's possible recovery, on its cross petition, to the hereinbefore mentioned $75.48 claimed in paragraph III thereof.

Thereafter, the jury returned a verdict for plaintiff in the amount of $2385.92, and the court entered judgment in his favor for $2375.92, after deducting a $10.00 for some unspecified part of the jury's allowance remitted by plaintiff. After the overruling of its motion for a new trial, defendant perfected the present appeal.

Defendant's arguments for reversal are presented under two propositions, some of which are rather vague and seem to transcend the scope of the proposition. For instance, its "Proposition One" reads:

"The court erred in excluding evidence of defendant's damages on its setoff and counterclaim due to plaintiff's errors, * * * (etc.) * * *",

but at page 14 of defendant's brief, we find the following argument under that proposition:

"* * * The great multitude of errors and mistakes found and discovered in each and every plat and plan prepared by him (Kalman), without exception, would almost permit the finding as a matter of law that reasonable care and skill in their preparation was not exercised! Certainly at least defendant was entitled to have this issue submitted to the jury! The trial court undoubtedly committed reversible error in *ruling* that the jury was not entitled to consider this issue as a basis for set-off or counterclaim." (Emphasis added).

As will be noted, neither defendant's Proposition One, nor the above quoted part of its argument, specifies the particular "ruling" of the trial court it refers to, as having excluded evidence from the jury's consideration; and none of defendant's other argument sheds specific light on this subject.

After carefully examining the record, we have concluded that defendant's claims of error can only refer to one, or all, of three of the trial court's rulings, namely: (1) His sustaining of plaintiff's hereinbefore mentioned special demurrers at the close of the evidence in chief; (2) His overruling of defendant's hereinbefore mentioned general demurrer, and its special demurrer on the ground of remoteness, to the evidence as a whole, at the close of plaintiff's so-called "rebuttal" evidence; (3) His eliminating from the jury's consideration, by giving Instruction No. 7 (consistent with his previous sustaining of plaintiff's special demurrers) of evidence as to defendant's hereinbefore described counterclaims for the $2,000.00 in interest accrual on the one-hundred-and-twenty-thousand dollar bank loan, the five-hundred-dollar part of the total sum defendant had paid Bud Harris Construction Company for street excavations, and defendant's counterclaim for said Company's partially refilling some of these excavations at a cost of $650.58, plus the $223.00 compaction testing expenses incurred in connection therewith.

■ Since there seems to be no disputing the fact that plaintiff had earned some part of the $3558.88, less $750.00, he sought as the first sum set forth in his amended petition's prayer (paragraph V of defendant's cross petition admitted he had earned $1344.36, less $750.00, for such work) and it is not shown that the trial court, in limiting plaintiff's recovery to $2435.92, by his Instruction No. 7, included any part of the $380.00 total of lot-staking fees (77 lots @ $5.00) plaintiff included in the net sum of $2798.88 he sought (which, as defendant's brief reminds us, was never proved to have been done) the trial court cannot be held to have erred in submitting to the jury for its determination of how much of the limited total amount plaintiff should recover on the "earned" (as distinguished from "would have earned") part of his causes of action against defendant (see Montgomery Ward & Co. v. Oldham, Okl., 391 P.2d 283), even if we consider defendant, by objecting to the giving of Instruction No. 7, as having challenged the evidence's sufficiency to go to the jury, notwithstanding failure of the record to show that it objected to the court's overruling of its said demurrers. Because plaintiff was undoubtedly entitled to go to the jury on part of his alleged causes of action, we are not impressed by defendant's arguments and citations of authority to the effect that an engineer's negligence and unskillfulness may bar his right to compensation for his services. Here, defendant admitted that plaintiff was entitled to recovery of the contract stipend for part of his services. Whether he was entitled to be paid for all, or for what part, of his services was for the jury to decide under proper instructions from the court.

Thus, if we consider the trial court's Instruction No. 7 in the same manner as the directing of a verdict in plaintiff's favor for any sum of money up to, and including, $2435.92, he claimed to have earned under the contract, by the same token, and for the purpose of our decision in this case

only, we will consider defendant's exception to the giving of said instruction as if it were an exception to a ruling of the court directing a verdict against defendant on all of the items of counterclaim in its cross petition, except those concerning the omitted sewer pipe and water pipe amounting to the total of $75.48.

■ Since, subsequent to the sustaining of plaintiff's special demurrers to the evidence as to other items defendant asserted as damages against plaintiff, in the manner of counterclaims ($2,000.00 for interest accrued during the 4-months' period, $500.00 for excessive excavations, $650.58 for partially refilling such excavations, and $223.00 for compaction tests) the testimony of Don Kelso, and other evidence "on rebuttal", tending to bolster plaintiff's defense against defendant's counterclaims, was introduced, and defendant, in its motion for a new trial characterized its demurrers at the close of this "rebuttal" evidence, as having "renewed at the conclusion of all of the evidence" its previous demurrer "to plaintiff's evidence in chief", we will disregard the court's rulings on defendant's demurrers to plaintiff's evidence, and, consistent with our procedure in analogous situations, consider the sufficiency of the evidence as a whole for submission to the jury on defendant's counterclaims for the above items. In this connection, notice Chicago, Rock Island & Pacific RR. Co. v. Kinsey, Okl., 372 P.2d 863, 865.

■ The two-thousand-dollar item which defendant sought against plaintiff as the equivalent of the interest, for 4 months, on the hereinbefore mentioned one-hundred-and-twenty-thousand-dollar loan was not a proper one for the jury's consideration. Assuming, without deciding, that this interest item might have been a proper basis for counterclaim, or offset, if properly proved to have been incurred through fault of the plaintiff, we agree with plaintiff's counsel that, on the basis of the evidence in this case, it is too remote and speculative to have been considered by the jury as an item of damage to defendant. In this connection see Trustees of Horton's Estate v. Sherwin, 63 Okl. 259, 164 P. 469, and Prager's Paris Fashions et al. v. Seidenbach et al., 113 Okl. 271, 242 P. 260. Apparently, defendant's theory was that if it had not been delayed four months longer (in obtaining F.H.A.'s clearance of the Addition as a situs for homes that could be built and/or purchased with F.H.A. insured loans) than plaintiff had led defendant's officers, at their early January, 1963, meeting with him, to believe was necessary, defendant would have saved the interest on that loan for that period. If that was defendant's theory, the evidence does not support it, because it fails to show that the loan's interest-accruing period would have been any shorter, if the Addition had been ready for F.H.A. home loans four months sooner than it was. While, according to the witness, Whitlock's testimony at the trial of this case in October, 1964, there were then "fourteen or fifteen houses completed and under construction" in said Addition, and he intimated that some of them had been sold, there was no evidence that any part of the interest, or principal, of the one-hundred-and-twenty-thousand-dollar loan had been paid from the proceeds of such sales, or from any other source, or would have been paid, if the Addition had been ready for home construction sooner.

■ We next consider the alleged errors of the trial court in excluding from the jury's consideration (by his sustaining of plaintiff's special demurrers and the giving of his Instruction No. 7, as aforesaid) defendant's five-hundred-dollar counterclaim for excessive street excavations and its counterclaims for the cost of correcting these claimed faulty results of plaintiff's work, by partially refilling these excavations, for which refilling defendant paid Bud Harris Construction Company the sum of $650.58, and paid $223.00 for compaction tests. Without regard to the absence of any specific evidence as to just what fraction of Bud Harris Construction Company's original excavation work defendant claimed was unnecessary and excessive, and how

much that part cost (the only evidence in the record on that subject is witness Whitlock's testimony that " * * * the initial excavation *which was found to be* excessive was $500.00"), we think the evidence, with all reasonable inferences therefrom favorable to defendant, wholly fails to show that any of it was excessive to the extent of constituting a breach of the parties' contract.

As hereinbefore indicated, defendant's claim that said street excavations, particularly the one at the corner of Fifth Street and Redwood Drive were excessive, was based on the theory that they were so deep that there would be so much difference between the elevations of the streets constructed in said excavations, and the surface of the lots adjoining them, as to diminish the lots' desirability as home building sites. According to the undisputed testimony of defendant's engineer-witness, Mr. Clark, these differences in elevations could have been alleviated by two practical methods, namely: (1) scraping much soil off of the surface of the lots, putting the scrapings in ravines and other low places in the addition, or (2) scraping less soil from the lots and using the scrapings to spread in the deepest street excavations to raise the latter's elevations (referred to as "back-filling") as was done, at Mr. Clark's suggestion, by re-engaging Bud Harris Construction Company and incurring the total of $873.58 in additional expenses hereinbefore mentioned.

While Mr. Clark testified that the cost estimate he made of using the method here designated as "(1)", after he was employed, totalled $1200.00, his testimony was to the effect that if that method had originally been used (inferentially before ravines and low places in the Addition had been filled with soil other than from the surface of the lots) it would have been cheaper than the back-filling or "(2)" method; and Mr. Clark's testimony was to the further effect that (as far as he knew) the lot-scraping, or (1) method, supra, was the one plaintiff had intended to use. For all that the evidence proves, the use of that method would not have jeopardized obtaining F.H.A. approval of the Addition, or of its lots as sites for homes with F.H.A. insured loans (on account of F.H.A.'s rules and regulations concerning construction on filled-in soil), and, a reasonable inference from the testimony of Mr. Kelso is that that method might have been used, had not Mr. Flow taken over supervision of the placement of the earth derived from the street excavation operations and countermanded plaintiff's directions to him as to what was to be done with it. In view of the above, the evidence as a whole failed to show a discharge of defendant's burden of proving that a breach, by plaintiff, of the parties' contract was the cause of any unnecessary part of the aforementioned earthwork expense totalling $1373.58 incurred by defendant; and the trial court committed no error in so holding, in effect, by his rulings on the hereinbefore mentioned demurrers and the giving of his Instruction No. 7.

As our conclusions concerning these actions of the trial court agree with plaintiff's argument that defendant was not entitled to have its disputed counterclaims submitted to the jury on the basis of the evidence as a whole, we consider the trial court's Instruction No. 3 (which defendant's brief refers to under its "PROPOSITION TWO" as invoking the doctrine of "estoppel" against it) a harmless error, if in fact it was erroneous in any respect. It is clear from the record as a whole, and other instructions given by the trial court, particularly Instruction No. 7, that the jury's verdict would have been no different had the court not given Instruction No. 3. In this connection, see Prudential Ins. Co. of America v. Foster, 197 Okl. 39, 168 P. 2d 295, 166 A.L.R. 1, and Parker-Gordon Cigar Co. v. Chicago, R. I. & P. Rr. Co., 94 Okl. 149, 221 P. 711.

As we have found no cause for reversal in the arguments presented by defendant, the judgment of the trial court is hereby affirmed.

All the Justices concur.