1999 OK 14

**CITIES SERVICE COMPANY, now OXY USA Inc., Plaintiff/Appellee,**

v.

**GULF OIL CORPORATION, now Chevron USA Inc., and GOC Acquisition Corporation, Defendants/Appellants.**

**No. 87,979.**

Supreme Court of Oklahoma.

March 2, 1999.

Rehearing Denied June 22, 1999.

---

Clyde A. Muchmore and Harvey D. Ellis, Jr., of Crowe & Dunlevy, Oklahoma City, OK; Charles R. Ragan and Craig S. Stewart of Pillsbury, Madison & Sutro LLP, San Francisco, CA; Stephen M. Shapiro, Andrew L. Frey and Philip A. Lacovara, Chicago, IL; and Bruce W. Freeman, John T. Schmidt and D. Richard Funk of Conner & Winters, Tulsa, OK, for the appellants.

Oliver S. Howard and Teresa B. Adwan of Gable Gotwals Mock Schwabe Kihle Gaberi- no, Tulsa, OK; W. DeVier Pierson, Knox Bemis and Peter J. Levin of Pierson Semmes and Bemis, Washington, D.C.; Sam P. Daniel, Jr. and Dallas E. Ferguson of Doerner, Saunders, Daniel & Anderson, Tulsa, OK, for the appellee.

LAVENDER, J.

¶ 1 While the appeal before us presents complex procedural questions of both state and federal character and some first-impression matters of adjective law, the case's legal issues are posed in the context of two rather straightforward queries—(1) Was Gulf Oil Corporation, now Chevron USA Inc., and GOC Acquisition Corporation [collectively Gulf] justified in terminating the merger agreement between itself and Cities Service Corporation, now OXY USA, Inc. [Cities]? and (2) If not, what then is the proper measure of damages to Cities occasioned by the breach?

# I

## FACTS AND PROCEDURAL HISTORY

### A

#### The State Court Action

¶ 2 The protracted legal drama—the subject of this opinion—began in the summer 1982. On June 15th of that year Cities and Gulf executed a merger agreement. On August 6, 1982 Gulf *unilaterally* terminated the contract. What transpired during the approximately seven weeks between those two dates has been scrutinized for over fourteen years in both federal and state litigation extending from Oklahoma's courts to the federal courts in New York.

¶ 3 On August 9, 1982 Cities filed its petition seeking damages not only for breach of contract but also for malicious breach or fraud. Gulf defended its cancellation of the merger, asserting that its act was justified under the agreement's terms (1) because the Federal Trade Commission [FTC] sought restraint of the transaction in federal court [the FTC defense][1] and (2) because Cities'

---

1. *See* the merger agreement ¶ 1.1 which conditions Gulf's performance upon compliance with Annex I conditions of the contract. Annex I provides in pertinent part:

overstatement of its proven oil reserves in its 1981 Securities and Exchange Commission [S.E.C.] filings breached the contract's warranty provisions[2] and caused the failure of a condition precedent to Gulf's performance [the oil reserve defense].[3] Cities responded that these defenses are not available to Gulf because *at the time* that Gulf decided to repudiate the merger agreement (1) it had not determined that Cities' overstatement of its oil reserves was *material* as required by the contract and (2) Gulf was precluded—on the basis of decisions reached in Cities shareholders' federal actions in New York[4] and in an arbitration conducted ancillary to one of the federal suits—from asserting the FTC's action as a defense to the merger's completion. Cities also contended that Gulf used the FTC's action in bad faith as a pretext for terminating the merger.

¶4 The trial of this cause began in April 1996 and extended almost three months. During this time the trial judge made several bench rulings, the ultimate effect of which was to deny as matters of law the defenses raised by Gulf to Cities' breach-of-contract claim. [Gulf's defenses to Cities' malicious breach or fraud claim otherwise remained viable when the case was submitted to the jury.] The FTC defense was abrogated when preclusive effect was given to orders entered in the shareholders' action in the U.S. District Court for the Southern District of New York.[5] Because Gulf represented [in paperwork filed in an arbitration proceeding ancillary to the New York federal litigation] that its board of directors had *not* concluded that the oil reserves differential was material *before or at the time it decided to terminate the contract,* the trial court ruled Gulf's failure to make the contractually-mandated determination (that Cities' oil reserve shortage was material) caused Gulf's oil-reserve-shortage defense to be legally unavailable for justification of its decision to repudiate the merger.

¶5 In an effort to identify the outward boundaries of any damages which might be awarded Cities, both parties proffered evidence during trial concerning the value of Cities' stock which was repurchased from Mesa Petroleum Corporation [Mesa] in June 1982.[6] Cities argued that the reacquired

---

(d) There shall be any action taken ... applicable to the Offer by any ... federal ... authority or there shall be in effect an order entered by any ... federal ... court which, in the sole judgment of Offer Sub [Gulf], (i) would make the acquisition of some or all of the Shares or the consummation of the Merger illegal, (ii) would require the divestiture by Parent or any subsidiary of Parent of any of the Shares or of a material portion of the business of either Parent and its subsidiaries, taken as a whole, or the Company and its subsidiaries, taken as a whole, or (iii) would impose material limitations on the ability of Parent and its subsidiaries effectively to exercise full rights of ownership of the Shares, including the right to vote the Shares acquired by it on all matters properly presented to the stockholders of the Company, or of a material portion of the Company and its subsidiaries, taken as a whole;
(e) The Company [Cities] shall have breached in any material respect its obligations under the Merger agreement.

2. Gulf asserts as the basis for this argument the provisions of the merger agreement ¶4.5 which provide in pertinent part:
"The Company [Cities] has also previously furnished, or will promptly furnish after the date hereof, to Parent [Gulf] a true and complete copy of each prospectus, definitive proxy statement and report filed by the Com-

pany with the Commission [Securities & Exchange Commission] since January 1, 1982. None of the statements or reports referred to above contained as of its date any untrue statement of a material fact or any omission to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of circumstances under which they were made, not misleading."

3. Gulf's oil reserves defense was actually comprised of six separate affirmative defenses sounding in both contract and fraud. *See* Gulf's Amended Answer to Petition, Original Record [O.R.] p. 13,076.

4. *See In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712 (S.D.N.Y.1989) and *In re Gulf Oil/Cities Service Tender Offer Litigation,* 1989 WL 123109 (S.D.N.Y.1989); *see also In re Gulf Oil/Cities Service Tender Offer Litigation,* 776 F.Supp. 838 (S.D.N.Y.1991).

5. *Id.*

6. The repurchase occurred after the Cities/Gulf Merger Agreement was executed. Neither party has contested the jury's finding that Cities' stock, *i.e.,* the 4.1 million treasury shares repurchased by Cities from Mesa, was bought *in reliance on the merger agreement.*

(treasury) shares held no value at the time of the merger's failure because (a) Cities already possessed an amount of treasury shares before purchasing the stock from Mesa which far exceeded its needs and (b) the merger's failure destroyed both Cities' ability to continue as an independent corporate entity as well as its earlier-avowed corporate objectives related to maintenance of that status. Gulf asserted that (1) the elimination of Mesa as a corporate raider, (2) settlement of the litigation relative to the tender offers between Cities and Mesa, and (3) the repurchased treasury shares all possessed offsetting value to the damages claimed by Cities which survive the failure of the Gulf/Cities merger. It was Gulf's position that (a) Cities has the burden of proving [monetarily quantifying] its reliance damages and (b) the burden's placement exonerated Gulf from having to adduce an evidentiary basis by which a jury could value the reduction to damages which it suggested during trial. The trial judge limited the time frame for computing damages to a period ending on August 13, 1982, i.e., one week after Gulf terminated the merger agreement. She reasoned the temporal constraint was appropriate because damages should be confined to a period of time close to the date of breach and selection of a cut-off was critical to the trial's manageability. The ruling prevented Gulf from introducing at trial evidence of Cities' merger with Oxy in the latter half of 1982. *After all evidence was presented,* the trial judge removed the question of the proper measure of Cities' damage from the jury's consideration. Her ruling was predicated upon the conclusion that in light of the then-adduced evidence a jury would have had to engage in speculation to calculate damages.[7] She instructed the jury that if it found the stock bought from Mesa was acquired in reliance on the merger agreement, damages on the breach-of-contract claim would equal the sum of (a) the repurchase-price paid by Cities and (b) the legal fees Cities expended in reliance on the merger agreement.

¶ 6    On July 19, 1996 the jury returned (a) a split [9 to 3] verdict which exonerated Gulf from liability for fraud or malicious breach of the merger agreement and (b) an unanimous verdict finding that Cities' June 1982 repurchase of its own stock from Mesa was in reliance on the Gulf/Cities merger contract. Judgment was entered for Cities in the amount of $229,621,400 plus that quantum of interest which is allowed under Delaware law.[8] Gulf then brought its appeal, over which we retained jurisdiction.

## B

### The Federal Court Actions

¶ 7    As a result of the merger's failure, several of Cities' shareholders who had offered their shares to Gulf pursuant to a tender offer circular (issued ancillary to the merger agreement), as well as persons who had purchased shares or options during the tender period, brought suit against Gulf and various of its officers and directors in the U.S. District Court for the Southern District of New York. The action was brought as a class complaint with one group of investors [the *Jones* group] opting not to participate in the class and proceeding separately. Both actions nonetheless were consolidated for trial.

¶ 8    Gulf moved for summary judgment in the federal suits alleging that the FTC's challenge of the merger excused its non-performance under the tender offer's explicit terms.[9] The federal trial judge [Judge Mukasey] ruled that *until such time as the FTC required a divestiture,* Gulf had no contractual obligation to negotiate in good faith with the FTC and in fact could use the

---

7.  The trial judge alerted Gulf to the possibility of this happening before Gulf put on its case by her ruling of April 14, 1996. *See* Tr. Trans. pp.2025–26.

8.  The merger agreement ¶ 10.8(iv) provided that the contract was to be governed by the law of Delaware.

9.  Gulf's FTC defense is conditioned upon language which is found in the tender offer circular ¶ 15(d).

agreement's "litigation out" clause [10] to justify the merger's repudiation. Nonetheless, he also ruled that once the FTC requested divestiture of a Cities' asset—here the Lake Charles refinery—the terms of tender offer circular ¶ 15(d)(1) [the "litigation out" clause] *standing alone* were not legally sufficient to justify unilateral withdrawal from the agreement. The federal trial court found that the *FTC-required divestiture* implicated the provisions of ¶ 15(d)(ii) & (iii) of the tender offer. These provisions require—as a legal predicate to withdrawal from the merger—Gulf's good-faith determination that the particular asset (for which divestiture is sought) represents a "material" portion of Cities' business, "taken as a whole." [11] The federal court reasoned that Gulf's requested construction of the "(d)(1)" provision [the "litigation out" clause] would have rendered the "(d)(2)" term meaningless. Hence, Judge Mukasey concluded that determination of materiality presented an unresolved issue of fact and denied Gulf summary adjudication.[12]

¶ 9 After Judge Mukasey denied summary judgment, Gulf settled with the shareholders class. Their suit was *dismissed with prejudice* by a May 21, 1992 order. While Gulf achieved settlement with the shareholder class, it could not agree with the *Jones* plaintiffs on certain issues of liability and damages. The non-settling parties agreed to submit the remaining issues [13] to final, binding, non-appealable arbitration. A retired chief judge of the U.S. Court of Appeals for the Second Circuit [Judge John Gibbons] was chosen as arbitrator. After a three week proceeding, he handed down an 84 page decision with findings of fact and conclusions of law.[14] After applying Judge Mukasey's ruling on the unavailability of the "(d)(1)" defense [15] (the FTC defense) the arbitrator found that Gulf's board of directors failed to decide (before it terminated the merger on August 6, 1982) that the August 3, 1982 FTC-requested divestiture of the Lake Charles refinery represented the loss of a "material portion of the assets or business of [Cities] taken as a whole." Hence, Gulf could not escape [by reliance on the FTC's actions] the liability attendant to its contractual obligation to purchase the tendered shares.

## II

## THE STANDARD OF REVIEW

■ ¶ 10 Assessment of the various errors alleged to have occurred in this case requires the application of differing standards of review. Gulf urges as errors in the proceedings below the following: (1) the partial summary adjudication given Cities which foreclosed [through use of the doctrine of offensive nonmutual collateral estoppel [16]]

---

10. The tender offer circular's litigation-out clause [¶ 15(d)(1)] mirrors in content the language of the Merger Agreement Annex I(d)'s provisions. For that language see *supra* note 1.

11. *See In re Gulf Oil*, supra note 4 at 742.

12. Judge Mukasey's rulings were predicated upon a record which reflected the parties had at that time filed 25 briefs (totaling 611 pages), 29 affidavits (totaling 666 pages) and 536 exhibits (totaling 4,889 pages).

13. The issues presented to the arbitrator included:

   1. Whether Gulf's Department of Energy's defense was valid as to any or all of the Jones parties, and, if so, to which ones;
   2. Whether Gulf had determined—as a predicate to its decision to terminate the merger agreement—that the Lake Charles refinery was a *material* portion of Cities' business, taken as a whole; and

   3. Damages and their calculation.

14. The arbitration proceeding produced a transcript in excess of 5000 pages. Both parties filed pre-hearing, post-hearing and reply briefs and made oral arguments at the opening and closing of the evidentiary hearing. The record in the arbitration included the examination of 27 fact and expert witnesses, designations from 118 depositions and more than 2000 fact and demonstrative exhibits.

15. The "(d)(1)" defense is premised upon the tender offer circular ¶ 15(d)(1) and is titled the "litigation out" defense by Judge Mukasey. The referenced paragraph mirrors the language found in Annex I(d) of the merger agreement, found *supra* at note 1.

16. In *offensive nonmutual collateral estoppel* the plaintiff seeks to prevent the defendant from litigating an issue that the defendant has earlier litigated and lost in an action with *another* party. Oklahoma first recognized the offensive use of

Gulf's FTC defense to the breach-of-contract claim; (2) the denial of Gulf's oil-reserves defense; (3) the trial court's directed verdict concerning the proper measure of Cities' reliance damages; and (4) the trial court's orders which limited the introduction of evidence about Cities' merger with Oxy USA Inc.

¶ 11 The legal standards which govern motions for summary adjudication and/or directed verdicts very closely approximate each other, if they are not indeed identical.[17] The review of both is de novo.[18] Neither are sustainable when reasonable persons can differ as to the choice of inferences which might be derived from the facts in evidence. It is only when all inferences which can be drawn from the evidence are in favor of the moving party that a directed verdict will withstand appellate scrutiny.[19]

■ ¶ 12 Here our review of the *availability* of offensive nonmutual collateral estoppel—which includes the requirements of identical issues actually and necessarily determined by a final and valid decision, i.e. *legal* conclusions—is plenary. Nonetheless, the trial court's decision to give preclusive effect to the earlier federal court ruling and arbitration award—i.e., whether the prerequisites of a full and fair opportunity to litigate the issue in the earlier proceedings and fairness are present [*factual* determinations]—is assayed by yet another standard.[20] In the latter regard we find the standard of review enunciated in *Parklane Hosiery Company, Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), persuasive and adopt it for determining whether issue preclusion was properly applied to Gulf's FTC defense.[21] *Parklane Hosiery* makes clear that a trial court's determination, whether preclusive effect should be given to an earlier decision, lies within its broad discretion.[22] Hence, while the doctrine's *availability* is reviewed de novo, the trial court's *application* of the doctrine will be considered under the deferential abuse-of-discretion standard.[23]

### III

### GULF'S FTC DEFENSE WAS PROPERLY PRECLUDED THROUGH APPLICATION OF OFFENSIVE NONMUTUAL COLLATERAL ESTOPPEL[24]

#### A. Introduction

■ ¶ 13 Review of Cities' invocation of offensive nonmutual collateral estoppel to preclude Gulf's FTC defense raises an inter-

nonmutual collateral estoppel in *Lee v. Knight*, 1989 OK 50, 771 P.2d 1003 [1989]. There the Court gave preclusive effect to the defendant's earlier criminal conviction to establish one element of the tort pressed by the plaintiff.

17. *Harder v. F.C. Clinton, Inc.*, 1997 OK 137, 948 P.2d 298, 302; *Handy v. City of Lawton*, 1992 OK 111, 835 P.2d 870, 873.

18. *Hulett v. First Natl. Bank & Trust Co.*, 1998 OK 81, 956 P.2d 879, 881.

19. *Harder*, supra note 17 at 302; *Davis v. Town of Cashion*, 1977 OK 59, 562 P.2d 854, 855.

20. For comparable analysis, see *U.S. v. Geophysical Corp. of Alaska*, 732 F.2d 693, 697 (9th Cir. 1984).

21. *See Raytech Corporation v. White*, 54 F.3d 187, 190 (3d Cir.1995), *cert. denied* 516 U.S. 914, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995).

22. *Parklane Hosiery Inc. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979).

23. *See Sandberg v. Virginia Bankshares, Inc. et al.*, 979 F.2d 332, 343–44 (4th Cir.1992).

24. We are guided in our review of when preclusive effect should be accorded to earlier federal court decisions by the first Justice Harlan's elucidation of the rationales for issue preclusion in *Southern Pacific R.R. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). There he said:

The general principle ... is that a right, question, or fact put in issue, and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination.

jurisdictional query. While federal law governs the preclusive effect to be accorded the earlier federal-court decision,[25] state law is determinative of whether Gibbon's arbitration award is entitled to equal effect.[26]

■ ¶ 14 Extant federal jurisprudence authorizes the use of an offensive,[27] nonmutual application of issue preclusion on a *case-by-case* approach.[28] Employment of this form of collateral estoppel requires: (1) the precluded issue be the same as that involved in the earlier action; (2) the issue was actually litigated; (3) it was determined by a final and valid decision; and (4) the determination was essential and necessary to the earlier result.[29] It is the review of these criteria which is de novo.

■ ¶ 15 A determination by the trial court that the defendant had a *full and fair opportunity to litigate* the issue in the earlier proceeding is also required as a predicate to the doctrine's employment.[30] Factors to be considered by the trial court in reaching its decision include: (1) whether the defendant had ample incentive to litigate the issue fully in the earlier proceeding; (2) whether the judgment or order for which preclusive effect is sought is itself inconsistent with one or more earlier judgments in the defendant's favor; and (3) whether the second action affords the defendant procedural opportunities unavailable in the first that could readily

produce a different result.[31] Other factors which can be relevant include: (1) whether the current litigation's legal demands are closely aligned in time and subject matter to those in the earlier proceedings;[32] (2) whether the present litigation was clearly foreseeable to the defendant at the time of the earlier proceedings; and (3) whether in the first proceeding the defendant had sufficient opportunity to be heard on the issue.[33] It is the trial court's application of these criteria which are reviewed under an abuse-of-discretion standard.

■ ¶ 16 Inherent in today's review of the propriety of the trial court's denial of Gulf's FTC defense is our consideration of a matter of first impression—the threshold question of whether the doctrine of offensive nonmutual issue preclusion applies to *arbitration awards* in civil matters which do not implicate federal statutory or constitutional rights. The Court in *Carris v. John R. Thomas and Assoc.,* 1995 OK 33, 896 P.2d 522, held that "[a]n arbitration award has the same force and effect as a judgment of a court of competent jurisdiction for claim preclusive purposes." [34] We see no cogent reason to accord arbitration awards a different effect for *issue* preclusive purposes in civil matters than the status earlier accorded them for *claim* preclusive (res judicata) pur-

---

**25.** *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1165 (5th Cir.1981);*Veiser v. Armstrong,* 1984 OK 61, 688 P.2d 796, 799; *see also Pope v. City of Atlanta,* 240 Ga. 177, 240 S.E.2d 241, 246 (1977); *Watkins v. Resorts Internat'l Hotel and Casino, Inc.,* 124 N.J. 398, 591 A.2d 592, 598 (1991).

**26.** *Veiser, supra* note 25 at 799.

**27.** As distinguished from the defensive use of nonmutual collateral estoppel recognized in *Blonder–Tongue Laboratories, Inc. v. Univ. of Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971).

**28.** *Parklane Hosiery, supra* note 22, 439 U.S. at 326, 99 S.Ct. at 645; *Jack Faucett Associates, Inc. v. A.T. & T,* 744 F.2d 118, 125 (1984), *cert. denied* 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985); *Carr v. District of Columbia,* 646 F.2d 599, 604 (D.C.Cir.1980).

**29.** *Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd.,* 63 F.3d 1227, 1231 (3rd

Cir.1995); *In re Graham,* 973 F.2d 1089, 1097 (3rd Cir.1992); *Gilldorn Savings Association v. Commerce Savings Association,* 804 F.2d 390, 392 (7th Cir.1986).

**30.** *Parklane Hosiery, supra* note 22, 439 U.S. at 331, 99 S.Ct. at 651.

**31.** *Parklane Hosiery, supra* note 22, 439 U.S. at 330, 99 S.Ct. at 651.

**32.** *Burlington Northern, supra* note 29 at 1235.

**33.** *Gilldorn Savings, supra* note 29 at 393.

**34.** *See also, Neely v. First State Bank, Harrah, Oklahoma and Sooner State Bank, Tuttle, Oklahoma, f/k/a The Bank of Tuttle, Tuttle, Oklahoma,* 1998 OK 119, 975 P.2d 435 where an arbitration award was given claim-preclusive effect for purposes of assessing the availability of a cause of action for malicious prosecution.

poses.[35] This conclusion does not lessen the need to assess whether the arbitral award passes muster under those standards which govern the use of issue preclusion based on a *court's* order. In addition to the earlier identified factors, the following criteria are relevant for assessing whether an arbitral award should be accorded preclusive effect: (1) special qualifications of the arbitrator, (2) the arbitrator's scope of authority under the protocol governing the proceeding, and (3) the procedural adequacy of the arbitration proceedings.[36]

¶ 17 The rationale for application of preclusive principles stated in *Knight*[37] still applies today. There we explained:

> Collateral estoppel—more graphically known as "issue preclusion"—and the related doctrine of res judicata—"claim preclusion"—"relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414; 66 L.Ed.2d 308 (1980).

Issue preclusion—be it based upon an arbitral award or a court's order/judgment—is an equitable doctrine. Where the parties' alignment and the raised legal and factual issues warrant and fairness to the parties is not compromised by the process, its application is appropriate. It is indeed the proceeding's substance and the degree of due process inherent in it, rather than its form,[38] which is the court's bellwether for the doctrine's application. Under the criteria prescribed today an arbitral decision can have *issue*-preclusive effect in a later suit, absent some abuse of discretion by the arbitrator.[39]

¶ 18 Here the trial judge denied Gulf's FTC defense by giving preclusive effect conjointly to (1) the federal trial court's September 12, 1989 order which denied Gulf's motion for summary judgment based on the "(d)(1)" component of its FTC defense[40] and (2) Judge Gibbons' arbitration award which addressed the "(d)(2) & (d)(3)" components. These rulings together represent a declaration of the legal meaning and effect of the language employed in the tender offer circular ¶ 15 (d)(1),(2) and (3), i.e., *set forth the law of the contract.* It is this same language—as found in the Merger Agreement Annex I(d)—which the trial court is required to construe and apply in the present case in order to discern the legal efficacy of Gulf's FTC defense.

## B. Legal Analysis of the Federal Court Order's Preclusive Effect[41]

¶ 19 Gulf assigns error to the trial court's application of offensive nonmutual

---

35. Today's pronouncement which recognizes that arbitral decisions can have preclusive effect when the arbitration in issue affords basic elements of adjudicatory procedure accords with both the common law and federal jurisprudence. *See* RESTATEMENT (2D) OF JUDGMENTS § 84(3). *See also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221–222, 105 S.Ct. 1238, 1242–43, 84 L.Ed.2d 158 (1985); *Parklane Hosiery, supra* note 22, 439 U.S. at 331, 99 S.Ct. at 651; *Universal American Barge Corp. v. J–Chem, Inc.*, 946 F.2d 1131, 1136–37 (5th Cir.1992); *Taines v. Bear, Stearns & Co., Inc.*, 855 F.2d 862 (9th Cir.1988)(unpubl.); *SCAC Transport (USA) Inc. v. S.S.Danaos et al*, 845 F.2d 1157, 1162 (2nd Cir. 1988); *Sanders v. W.M.A.T.A.*, 819 F.2d 1151, 1157 (D.C.Cir.1987); *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360–61(11th Cir.1985); *Zink v. Merrill Lynch Fenner & Smith, Inc.*, 1992 WL 554240 (N.D.Okla.).

36. *See Greenblatt, supra* note 35 at 1360;

37. *Knight, supra* note 16 at 1005.

38. In this regard, see *Board of County Commissioners v. McIntosh*, 30 Kan. 234, 1 P. 572, 575 (1883).

39. RESTATEMENT (2D) OF JUDGMENTS § 84(3)(1982).

40. Gulf asked the federal court (by a motion for reargument) to find that its earlier order did not preclude Gulf from terminating its offer to Cities in reliance on the tender offer ¶ 15(d)(1), *once* the FTC secured the July 29, 1982 temporary restraining order. In an October 11, 1989 order Judge Mukasey ruled that Gulf's "motion accordingly is without foundation," affirming that as a matter of law his earlier order required Gulf to determine that the Lake Charles refinery represented a material asset of Cities' business "taken as a whole" before it could terminate the merger. *In re Gulf Oil, supra* note 3, 725 F.Supp. at 742–43.

41. Gulf does *not* assert that the precluded issue [the effectiveness of the "d(1)," i.e., FTC, defense] is not the same issue as that addressed by

collateral estoppel in the case before us, asserting that (1) the federal court's order was not sufficiently final to support the doctrine's application; and (2) the settlement agreement between itself and the shareholder class "preserved" Gulf's right to raise any defenses which it might have in future litigation.[42] Gulf's requested FTC defense requires the trial judge here to construe *again* the same contractual language which Judge Mukasey had already concluded as a matter of law did not authorize Gulf's use of the "d(1)" [FTC] defense to repudiate the merger.

■ ¶ 20  Under extant federal jurisprudence *finality* as a criterium for application of issue preclusion is a much more flexible concept than that "finality" which is required in the assessment of a district court order's appealability or res-judicata effect. It does not equate with a judgment which ends the litigation and leaves nothing more for the court to do except execute the judgment. Rather, an order's finality for issue-preclusion purposes is assessed by determining whether the *conclusion in question is procedurally definite.* Particularly relevant to the latter decision are such factors as "the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review."[43]  The Seventh Circuit of the U.S. Courts of Appeals' reasoning in *Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990 (7th Cir.1979), *cert. denied* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980), illustrates this point. There, where the court was considering whether to extend collateral-estoppel effect to an interlocutory order (the denial of an application for a temporary injunction), it held:

"To be 'final' for purposes of collateral estoppel the decision need only be immune, as a practical matter, to reversal or amendment.  'Finality' in the sense of 28 U.S.C. § 1291 is not required."  *Id.* at 995.  [§ 1291 addresses the courts of appeals' jurisdiction over *final* decisions of district courts]

Hence, finality for collateral-estoppel purposes is assessed in the context of the broader question whether the party—against whom the doctrine is to be applied—had a "full and fair" opportunity to *litigate to a conclusion* the precluded *issue* [as distinguished from *claim*] in the earlier proceeding.[44]

■ ¶ 21  Under the above criteria the federal court order here in issue is sufficiently firm to be accorded preclusive effect in the cause before us.  There is nothing in the federal trial court's well-reasoned, 42-page Opinion and Order which suggests that

---

and litigated in the federal court proceedings. Hence, the trial court's order is not subject to challenge on these grounds.

42.  Gulf contends the following language in the Stipulation of Settlement between itself and the shareholder class preserves its defenses:

*This Stipulation and each of its provisions*, and the Settlement provided for herein, ... and any negotiations, proceedings or agreements relating to the Stipulation, or any matter arising in connection with such negotiations, proceedings or agreements are not and *shall not in any event be*:

(A) *construed as, offered in evidence as, received in evidence as, and/or deemed to be evidence* of a presumption, concession or an admission by any defendant of the truth of any fact alleged or the validity of any claim which has been, or could have been asserted in the Litigation, or *of the deficiency of any defense which has been, could have been, or in the future might be asserted in any litigation....* [Emphasis added by the Court.]

43.  *Lummus Co. v. Commonwealth Oil Refining Co., Inc.*, 297 F.2d 80, 89 (2nd Cir.1962), *cert.* *denied*, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962).

44.  We are mindful of Gulf's reliance on *Kay–R Elec. Corp. v. Stone & Webster Const.*, 23 F.3d 55, 59 (2d Cir.1994) for the proposition that an order denying summary judgment cannot support collateral estoppel.  Nonetheless, we are persuaded that the Court's admonition in *Parklane Hosiery, supra* note 22, 439 U.S. at 331, 99 S.Ct. at 651, that the availability of issue preclusion must be decided on a case-by-case basis obfuscates application of such a bright line rule.  We note that in Kay–R Elec. the court prefaced its decision not to give preclusive effect to the order denying summary judgment on its observation that the court does "not know why summary judgment was denied in that case, and it is clear that for collateral estoppel to bar a party on an issue, the issue in dispute must actually have been litigated and actually decided."  *Id.* at 59.  The latter observation cannot be made about Judge Mukasey's ruling.

it was intended to be tentative. Judge Mukasey held that as a matter of law the "d(1)" [FTC] defense was not available to Gulf after August 3, 1982—the date on which the FTC requested divestiture of the Lake Charles refinery.[45] In reaching his decision Judge Mukasey reviewed an extensive record containing [as he described them] "elephantine" briefs. Availability of the "(d)(1)" defense, i.e., the "litigation out" clause, to the shareholders' breach-of-contract claim was *necessarily litigated and decided* by Judge Mukasey's denial of Gulf's quest for summary adjudication based on this theory. Further, because the shareholder litigation was dismissed with prejudice, no argument can now be made that the Opinion and Order in issue is *susceptible to reversal or amendment.* For these reasons we find Judge Mukasey's order possesses that degree of *finality* necessary to support the offensive nonmutual application of collateral estoppel.

¶ 22 Gulf suggests that Judge Mukasey's order should be denied the finality requisite for issue preclusion's use because the federal action was dismissed before judgment was entered as the result of a negotiated settlement.[46] While ordinarily the party against whom preclusion is sought can prevent a judgment from being given preclusive effect if appeal from it were not initially available, this is so only *where review has been denied as a matter of law.*[47] Here the lack of appellate review *is the product of a private agreement,* albeit one approved by the district court. The Court too is mindful that when dismissal was accomplished, not only was the Oklahoma litigation foreseeable to Gulf and its counsel, they had actual knowledge of the present case's pendency (since its filing predated the shareholder action).[48] Also, we do not read the Stipulation of Settlement[49] so broadly as Gulf would have us when it contends that the stipulation *specifically* preserves "Gulf's right to raise all defenses *in any future litigation*" and evidences the settling parties' intent that the federal trial court's order be in effect vacated. Giving the language relied upon its plain and ordinary meaning, it at best proscribes *use of the Stipulation of Settlement as evidence* of any defense's deficiency in any future litigation. The state trial court did not base its order (applying issue preclusion) on the stipulation but rather on Judge Mukasey's earlier-entered order. Lastly, we do not perceive that today's holding will dissuade parties from settling their differences *sans* trial, although it might encourage them to make certain that their settlement agreements address orders earlier entered by the court which could be afforded preclusive effect in later litigation.[50]

¶ 23 Gulf's Annex I(d)(i) defense is unquestionably the same defense as that litigated in the earlier federal shareholder action since it is based upon the same contrac-

---

45. *See In re Gulf Oil, supra* note 3 at 738, 742–43. Any doubts which Gulf may have had about Mukasey's order were extinguished by his later October 11, 1989 order where he assured Gulf on reargument that "the points now pressed by defendants ... were not overlooked." He then denied Gulf's motion for reargument which sought to clarify the availability of the tender offer circular ¶ *15(d)(1)* defense in the face of the FTC seeking a T.R.O. *See In re Gulf Oil/Cities Service Tender Offer Litigation,* 1989 WL 123109 (S.D.N.Y.1989).

46. Gulf apprizes the Court that giving Judge Mukasey's order preclusive effect would discourage settlements.

47. *See* RESTATEMENT (2D) OF JUDGMENTS § 28(1) (1982).

48. Original Record (O.R.) 5855, 5861–62.

49. For the Stipulation's pertinent language see *supra* note 42.

50. Four years before the settlement here in issue, the U.S. Court of Appeals for the Second Circuit addressed whether settling parties could require a district court to vacate its earlier orders to avoid their being accorded preclusive effect. In *Nestle Co., Inc. v. Chester's Market, Inc.,* 756 F.2d 280, 282 (2nd Cir.1985) the Second Circuit (the circuit which encompasses the U.S. District Court for the Southern District of New York) held that it was an abuse of discretion for a district court *to refuse* to enter a vacatur requested pursuant to a settlement agreement. *Nestle* was cited with approval in *Harris Trust & Savings Bank v. John Hancock Mutual Life Ins. Co.,* 970 F.2d 1138, 1146 (2nd Cir.1992), *cert. denied* 507 U.S. 986, 113 S.Ct. 1585, 123 L.Ed.2d 151 (1993), where the court observed that a "vacated order has no collateral estoppel effect." [Emphasis added.]

tual language and facts. Because our de novo review of the state trial court's use of offensive nonmutual collateral estoppel yields no evidence of legal error, we next review its application of the doctrine for abuse of discretion. Gulf's contingent liability in the shareholder litigation was in the millions of dollars. This amount of liability exposure will provide any litigant with ample incentive to litigate. The instant cause was not only foreseeable to Gulf, it had actual knowledge of it while proceeding through the federal litigation. Finally, we note that Gulf was afforded, and evidently took advantage of, all opportunities to brief the issue of its FTC defense's availability under the terms of tender offer circular ¶ 15(d)(1) before the federal court.[51] Gulf has not drawn our attention to any procedural opportunities available in the state court which were capable of producing a different outcome from that reached in the federal court. Lastly, there are no *other* judicial pronouncements of which we have been made aware which concern the availability of the "(d)(i)" defense to Gulf. In sum, we see no indicia of abuse of discretion by the state trial judge in her decision that Gulf was given a full and fair opportunity to litigate its "(d)(1)" defense in the earlier federal actions.

## C. Legal Analysis of the Arbitration Award's Preclusive Effect

■ ¶ 24 The arbitrator's award—to which the state trial judge ascribed issue-preclusive effect—was the product of a *three week proceeding* before Judge John Gibbons. There is no dispute about Judge Gibbons' (a retired Chief Judge of the Second Circuit of the U.S. Courts of Appeals) qualifications to arbitrate the *limited* contractual issues submitted to him under the arbitration agreement's terms. The parties instructed him (1) to rely upon Judge Mukasey's rulings in the shareholders' action [including the order de-

nying Gulf's "(d)(1)" defense] and (2) to decide whether Gulf had made the contractually mandated determination that the Lake Charles refinery was a material asset of Cities' business, "taken as a whole", before it repudiated the merger agreement on August 6, 1982.[52] If he found the tender offer circular ¶ 15(d)(2) & (3) defenses were factually unavailable and that Gulf was liable to the *Jones* plaintiffs, he was to determine damages. In a well-reasoned 84 page opinion Judge Gibbons[53] made findings of fact and drew conclusions of law which closely resemble those which would be found in a district court's judgment. He decided that Gulf had *not* made the requisite determination that the Lake Charles refinery was a material part of Cities' business taken as a whole, before it backed out of the merger. It is this aspect of the arbitrator's decision which the state trial judge gave preclusive effect to when she decided that as a matter of law Gulf could not rely upon the merger agreement Annex I(d)(ii) & (iii) provisions to defend against Cities' breach-of-contract claim.

¶ 25 The record is clear that the arbitrator's scope of authority under the Submission Agreement and ADR Protocol embraced consideration of whether Gulf could avoid breach-of-contract liability by reliance on the tender offer circular ¶ 15(d)(2) & (3) provisions. The extent of the evidence reflected in the arbitration record[54] reflects that Gulf was afforded an ample opportunity to establish an evidentiary basis for the defense's availability. Certainly the upward range of possible liability (in the millions of dollars) to which Gulf agreed under the arbitration agreement's terms provided it every incentive to litigate fully and vigorously and Gulf in fact did so. Gulf's position that it would have taken the state trial court "months of time extending over several years" to determine if Gulf had made the requisite material-

---

**51.** *See supra* note 12 for a more complete description of the record upon which Judge Mukasey based his decision.

**52.** On November 8, 1991 Judge Mukasey considered what the parties meant "by an asset or business of Cities that was 'material' in relation to the other assets or business of Cities." The federal trial judge ruled that whatever "material" included, it did not encompass Gulf's expenses

incurred as a result of having to divest or hold separate the Lake Charles refinery.

**53.** For the scope of the record considered by Judge Gibbons in reaching his decision, *see supra* note 14.

**54.** *See supra* note 14.

ity determination is not well taken. We find the record amply·demonstrates that Gulf was afforded the basic elements of adjudicatory procedure in the arbitration. Further, Gulf's insistence that a *private agreement* not to appeal the arbitrator's decision—when absent that agreement the award could have been reviewed as a matter of law—can prevent preclusive effect being accorded the arbitrator's decision is not persuasive.[55] In light of Gulf's being afforded a full and·fair opportunity to litigate the availability of the "(d)(2) & (3)" defenses in the arbitration and the further fact that the particular issue was actually decided by the arbitrator and necessary to his award, the state trial judge's decision to apply offensive nonmutual collateral estoppel to the arbitration award is sustained.

### D. Conclusion About The Availability Of Collateral Estoppel In This Cause

¶ 26  Upon review of the application below of offensive nonmutual collateral estoppel we conclude that Gulf was properly precluded as a matter of law from asserting its .FTC defense—as based on the provisions of Annex I(d)(i), (ii) & (iii)—to Cities breach-of-contract claim. In the earlier federal litigation Gulf had its day in court on what the contractual language in issue meant. Application of collateral estoppel here promotes that symmetry of judgment which is one of the desired objects of efficient and effective adjudication and insures that the contractual language—found in both the merger agreement and the tender offer circular—is accorded the same meaning.

**55.**  *See* our discussion above of the effect of a private agreement on a trial court order's appealability. *See also* RESTATEMENT (2D) OF JUDGMENTS § 28(1) (1982).

**56.**  For its proposition Gulf relies upon two *unreported* cases decided by lower Delaware courts; *Eastern Electric and Heating, Inc. v. Pike Creek Professional Center,* 1987 WL 9610 (Del.Super.Ct.) and *Brywil, Inc. v. STP Corp.,* 1980 WL 77945 (Del.Ch.). The argument Gulf makes is nonetheless closely allied to the common-law principle that he who prevents a thing being done shall not avail himself of the non-performance he has occasioned and is recognized under Delaware jurisprudence. *See Gilbert v. The El Paso Company,* 490 A.2d 1050, 1055 (Del.Ch.

## IV

### DENIAL *AS A MATTER OF LAW* OF GULF'S OIL–RESERVE DEFENSE TO ·CITIES' BREACH–OF–CONTRACT CLAIM IS SUSTAINED

¶ 27  Gulf asserts that Cities *materially* overstated its oil reserves in its 1981 Securities and Exchange Commission [S.E.C.] filings and in so doing breached the merger agreement's terms. Gulf also reasons that Cities' overstatement of its proved oil reserves breaches a condition precedent to its performance and excuses the merger's repudiation regardless of when the overstatement was discovered and even if Gulf in error had earlier predicated the contract's cancellation upon some other ground.[56] The latter defense is based upon Delaware law [57] which Gulf asserts would allow a later-discovered Cities' breach [i.e., one learned of after August 6, 1982] to absolve it from liability. Gulf alleged at trial an after-discovered shortage of Cities' proved oil reserves greater than the one first identified by its engineers in July 1982.

¶ 28  Gulf also contends that under the merger agreement's provisions Cities "expressly" warranted its oil reserve figures.[58] This ·characterization of the contract's ¶ 4.5 language sweeps too broadly. Paragraph 4.5's terms evince the contractual requirement that Cities' reports (filed with the·S.E.C.) contain no misleading or untrue statements of material facts when the same are considered "in light of the circumstances under which they were made." [59] Annex

1984); *T.B. Cartmell Paint & Glass v. Cartmell,* 186 A. 897 (Del.Super.Ct.1936).

**57.**  *See supra* note 56.

**58.**  *See* Gulf's brief in chief, p. 34. Gulf bases its conclusion that Cities warranted its oil reserves on the language found in the merger agreement Annex I(e) and ¶ 4.5. For this language see *supra* notes 1 and 2.

**59.**  The representation of oil reserves which Gulf contends is materially misleading or untrue is found in Cities' 1981 Annual Report, p. 44. The statement of oil reserves found there was made subject to the following caveat:
"Reserve determinations are Management's best *estimates* and generally are related to

I(e)'s language also requires Cities' contractual performance not breach the agreement in any *material* respect. By giving the contractual language in issue its plain and ordinary meaning, we conclude that the trial court correctly construed the implicated terms when she found that (1) they did *not* create an *express* warranty of a particular reserve figure by Cities [60] and (2) they required proof that Cities had breached the merger agreement in a *material* way if the same were to justify Gulf's non-performance.[61]

¶ 29 It is undisputed that *on July 13, 1982* Gulf's engineers reported to its board of directors that they perceived a possible 41.7 million barrel shortfall from the proved-oil-reserve-estimate stated in Cities' 1981 annual report filed with the S.E.C.. With knowledge that its board was aware in July 1982 of the possibility of a 41.7 million barrel shortage in Cities' reserve figures, Gulf represented in paperwork filed in the New York arbitration before Judge Gibbons:

> economic, regulatory and operating conditions.
> Reserve data filed with Federal agencies, including the S.E.C., vary insignificantly due to definitional differences." [Emphasis added.]

Gulf's 1981 annual report (filed with the S.E.C.) evidences its degree of sophistication with prognostications of the type here in issue when in regard to its own reserve estimates, it stated: "The oil and gas reserve data presented below are ... based on current estimates made by the Company. In presenting this information, the Company wishes to emphasize that estimates by their very nature are inexact and subject to constant changes and revisions, ...."
*See* Plaintiff's Exh. 154, p. 46.

**60.** In its brief in chief Gulf also asserts that the merger agreement's language created an *express* condition subsequent. Again, Gulf would read the language of ¶ 4.5 to create an *express* warranty by Cities of its statement of oil reserves in its 1981 annual report filed with the S.E.C. For the oil reserve statement to be *expressly* warranted under the merger agreement provisions Cities would have had to state in specific written language that it was warranting the identified oil-reserve figure. *Inman v. Stephenson*, 170 Okla. 548, 40 P.2d 1107 syl. 1 (Okla.1935). It did not do so. Instead, giving ¶ 4.5's language its plain and ordinary meaning, it requires no more than Cities' statements in its 1981 annual report filed with the S.E.C.—taken in light of the circumstances under which they were made—were not

·"94. The possible oil reserves shortfall discovered in early July did not cause the Gulf Board to terminate on August 6. The directors concluded that they had insufficient information to resolve the difference between Cities and Gulf engineers concerning Cities' oil reserves as of July 1982, and accordingly determined that the information reported to them at that time was not material."

When Gulf was asked in the Tulsa County District Court litigation to admit the truth of its representation to the arbitrator, it stated that its directors "accordingly determined that the information reported to them at that time [August 6, 1982] was not material." [62] Gulf's admissions evidence that regardless of how "materiality" is defined, as of August 6, 1982 Gulf [through its board of directors [63]] had determined that a projected 41.7 million barrel shortage was not material. There is no legal merit to Gulf's attempts to avoid the legal effect of its earlier admissions at this stage.

untrue or misleading. In its annual report Cities clearly qualified the statement of its proved oil reserves as an *estimate*. *See supra* note 59 for the relevant contractual language.

**61.** For an overview of Delaware rules of construction of contractual language, see *U.S. West, Inc. v. Time Warner, Inc.*, 1996 WL 307445 (Del. Ch.), at *8–*11. There the court observed that

> "[t]he primary rule of construction is this: where the parties have created an unambiguous integrated written statement of their contract, the language of that contract (not as subjectively understood by either party but) as understood by a hypothetical third party will control."

**62.** *See* plaintiff's exhibit 4005, Gulf's Response to Cities' May 18, 1995 Request for Admissions. *See also* trial judge's ruling which deemed Gulf to have admitted that its board of directors did not determine Cities' alleged oil reserve shortage to be material in July 1982. Trial trans. pp. 11926–27.

**63.** Gulf would have the Court assay materiality through a "reasonable man's" eyes and not that of its board. Were the common law determinative of the issue, Gulf might prevail upon its argument. However, here the judge of "materiality" is fixed by the Agreement as Gulf and not the common-law's reasonable man. *See* merger agreement Annex I(a). Hence, Gulf's argument is without merit.

■ ¶ 30 The critical question now becomes whether there was record proof of a shortfall in Cities' proved oil reserves greater than the 41.7 million barrel differential admitted not to be material by Gulf. In light of its admissions Gulf's assignment of error to the trial court's denial of its oil-reserve defense can only be sustained if there is record proof (1) that Cities' estimate of its proved oil reserves [as calculated according to S.E.C. regulations] was overstated in an amount greater than the earlier Gulf estimate of 41.7 million barrels and (2) that the bigger shortage was *material*.[64] Without this proof in the record there is no evidentiary basis for submission of the *materiality issue* (implicated by the oil-reserve defense) to the jury.

¶ 31 Gulf anticipated being able to prove error and fraud in the methodology which Cities used to estimate its oil reserves by the testimony of John Lee, an expert. After voir dire examination of Lee, the trial judge excluded his testimony because his *trial* testimony substantially contradicted his earlier *depositional* testimony. She found that Lee's change of positions undermined the benefit of the earlier expert discovery deposition which Cities had taken of Lee [65] and was hence prejudicial and unfair. Without Lee's testimony there is no record proof of an oil-reserve differential greater than the one already admitted by Gulf not to be material. Hence, whether the oil-reserve defense was properly denied ultimately rests upon whether the trial judge committed reversible error in her exclusion of evidence—i.e., Lee's prof-

fered testimony concerning shortages in Cities' oil-reserve estimate as reported in its 1981 S.E.C. filings.

■ ¶ 32 A trial judge's decision to exclude evidence will not be overturned absent a *clear* abuse of discretion.[66] "Abuse of discretion" is the applicable standard of review regardless whether the excluded testimony is outcome-determinative.[67] It is incumbent upon a trial judge in his/her role as the "gatekeeper" of the evidentiary process to screen evidence, i.e., to determine its relevance and reliability.[68] The Oklahoma Evidence Code specifically approves the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice ... or unfair and harmful surprise." [69]

■ ¶ 33 In January 1995 an expert discovery deposition was taken of Lee. Because of concerns generated by Lee's testimony the trial judge ordered a voir dire examination of him before she decided whether to limit his testimony or to exclude parts of it. In Lee's earlier deposition he stated (1) that he had never prepared oil reserves estimates for S.E.C. filing or tender offer purposes; (2) that this was his "maiden voyage" in calculating oil reserves under S.E.C. definitions; (3) that he had never done any economic analysis of proved developed oil reserves' value; and (4) that he had never heard the terms "project reserves" or "unit reserves" or reserves referred to as "field reserves." Nonetheless, during voir dire examination at trial Lee testified that he understood the term "project reserves" and had "done it myself many times, probably

---

**64.** Delaware law is clear that mere inconvenience or substantial increase in the cost of compliance will not excuse a duty to perform contractual obligations. *Ridley Investment Co. v. Croll*, 192 A.2d 925, 926 (Del.1963); *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 169 (Del.Super.Ct.1969).

**65.** *See* Tr. trans. pp.11087 –11091, 11043–11068, 10992–10993.

**66.** *James v. State Farm Mut. Auto. Ins. Co.*, 1991 OK 37, 810 P.2d 365, 371; *Gabus v. Harvey*, 1984 OK 4, 678 P.2d 253, 257; *Graves v. Graves*,

1970 OK 177, 475 P.2d 171, 177. *See also General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997).

**67.** In this regard we find the rationale of *General Elec. Co., supra* note 66 to be persuasive.

**68.** *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993). *See also* LEO H. WHINERY, OKLAHOMA EVIDENCE § 2702 Author's Comments (1985).

**69.** 12 O.S.1991 § 2403.

hundreds." [70] "Project reserves" is an integral element of Gulf's assignment of error to the way in which Cities calculated its proved oil reserves as used in its S.E.C. filings.[71] Gulf attempts to defend the differences in Lee's testimony as "amplifications" of his earlier testimony but not really changes. Lee himself acknowledges that his initial answers to these questions had the effect of depriving Cities of the opportunity to meaningfully probe the basis of his opinions.[72] The transcript reveals that the trial court's judgment (calling for exclusion of parts of Lee's testimony) was not exercised arbitrarily and further was not against reason and evidence. Our review of the record does not disclose a clear abuse of discretion by the trial judge; hence, her exclusion of Lee's testimony is sustained.

¶ 34 It is almost axiomatic that to submit an issue not supported by competent evidence to the jury would be prejudicial error on the trial judge's part.[73] Without Lee's testimony there is no evidentiary basis to establish a shortfall in Cities' oil reserves greater than 41.7 millions barrels nor is there any basis for assessing the *materiality* of the same. Hence, because there is no record proof of a greater shortfall in Cities' oil reserves than the one earlier admitted not to be material, the trial judge's elimination as a matter of law of Gulf's oil-reserve defense was not error and is affirmed.

70. Tr. trans. pp. 11044–11055.

71. Tr. trans. pp. 10993–94.

72. Tr. trans. p. 11056.

73. *Okmulgee Window Glass Co. v. Bright*, 65 Okla. 53, 183 P. 898, 899 (1917); *Oklahoma City v. Hayden*, 169 Okla. 502, 37 P.2d 642, 644 (1934); *Guest v. Shamburger*, 120 Okla. 164, 251 P. 97, 98 (Okla.1926).

74. Cities expended $225.5 million to repurchase 4.1 million shares of its own stock from Mesa in June 1982.

75. At trial Gulf vigorously denied that it authorized Cities to repurchase the treasury shares. Rather, Gulf insisted (1) that the purchase was

### V

## THE TRIAL COURT DIRECTED A VERDICT ON THE AMOUNT OF CITIES' RELIANCE DAMAGES TO PREVENT SPECULATION AND CONFUSION IN THE JURY'S DELIBERATIVE PROCESS; HENCE, IT IS NOT ERROR

### A.

¶ 35 Gulf asserts error in the trial court's direction of a verdict on Cities' reliance damages, alleging that by so doing the trial court invaded the jury's province. Although Gulf takes no issue with the amount which Cities paid to repurchase its stock from Mesa,[74] it asserts error in the directed verdict because it does not reflect *reductions* from the purchase price for (1) the value of eliminating the threat of Mesa as a corporate raider, (2) the settlement value of the tender-offer-related litigation pending between Cities and Mesa at the time of the repurchase, and (3) the *in futuro* value of the treasury shares to Cities' shareholders.

¶ 36 Cities' *entitlement to reliance damages* is confirmed by the jury's verdict which stands unchallenged by either party.[75] The reliance-damage award has as its object undoing the foreseeable harm caused by Cities' reliance on Gulf's promise, i.e. to restore the non-breaching party to the position which it occupied when the contract was entered.[76] The issue—whether the trial court properly measured Cities' damages—becomes one of proof, i.e., what harm by way of reliance on the merger agreement can Cities prove with reasonable certainty.[77] Inherent in Cities'

not made in reliance on the merger agreement and (2) that Cities settled with Mesa at its own instance and for its own separate corporate purposes. Inherent in the unchallenged jury's verdict that the stock was repurchased in reliance on the merger agreement is a rejection of Gulf's assertions.

76. For a scholarly analysis of the nature of reliance damages, see L.L. Fuller and William R. Perdue, Jr., *The Reliance Interest in Contract Damages*, 46 Yale L.J. 52 (1936–1937).

77. 23 O.S.1991 § 21. Its pertinent provision provides:

"No damages can be recovered for a breach of contract, which are not *clearly ascertainable* in both their nature and origin." [Emphasis added.]

proof of *reliance* damages is the limitation that an award be only for harm *occurring at or before the time of Gulf's breach.*

¶ 37   Cities proffered evidence that immediately after Gulf's repudiation of the merger its life as an independent corporation was doomed and it had to either liquidate itself or find a merger partner.[78]   This evidence goes to the value of the Mesa settlement to Cities in its condition when the Gulf/Cities merger failed.   Cities' asserts that what held value to it as an independent corporation became valueless when the failed merger required it to put itself on the sale block.   De novo review reveals that Cities did adduce competent evidence showing (1) that it paid $225.5 million to Mesa for the treasury shares and expended $750,000 in legal fees in reliance on the merger agreement and (2) that *at the time of Gulf's breach (August 6, 1982)* Cities had no need for additional treasury shares.   Hence, Cities established a prima facie case that the repurchased treasury shares were valueless to it after Gulf's repudiation of the merger agreement.   At this point in the trial it became incumbent upon Gulf to refute Cities' proof of reliance damages.

¶ 38   Oklahoma's extant jurisprudence provides that when a defendant (breaching party) asserts matters in reduction—either in whole or part—of the damages sought by a plaintiff's breach-of-contract claim, the burden of proving the reductions [which encompasses both burdens of producing evidence and of persuasion [79]] is upon the defendant.[80]   Inherent in the delineated probative process is the requirement that a defendant ascribe value to the matters offered in reduction. Failure to provide an evidentiary basis for

monetarily appraising the reductions has potential for introducing uncertainty into the jury's ascertainment of the *fact* of the suggested reduction and hence interject impermissible jury speculation into the trial.   The proscription against a jury speculating about damages is well stated in *Bokoshe Smokeless Coal Co. v. Bray et al,* 55 Okla. 446, 155 P. 226 syl. (Okla. 1916), where the Court held:

> "Conjecture is an unjust and unsound basis for a verdict, and speculative, remote, or contingent damages cannot form the basis of a lawful judgment.   Juries may not legally guess the money out of one litigant's pocket into that of another."

Lastly, to require the plaintiff to value the reductions alleged by the *breaching* party (as Gulf suggests should be done here)—under the guise of the law's requirement that a plaintiff must prove its damages—is tantamount to transferring the assigned burden of proving the fact of the *reductions* to the non-breaching party.   Gulf's attempt to shift the burden of proof to Cities on this issue contravenes Oklahoma's extant jurisprudence and is disallowed.   The trial court properly required Gulf to prove the fact of any reductions to damages which it suggested.

¶ 39   Oklahoma requires that damages be "clearly ascertainable".[81]   When a breaching party chooses to assert reductions to damages, it must do so with the same degree of proof required of the plaintiff.   If a party fails to carry the assigned burden, the trial court may as a matter of law direct a verdict against it.   This is consistent with a trial judge's affirmative obli-

---

78.   See Pl. Exh. 732R.

79.   For a scholarly discussion of the elements of "burden of proof," see L. WHINERY, OKLAHOMA EVIDENCE §§ 8.02–8.03 (1994).   For a delineation of the distinctions between the burdens of persuasion and of production, see *Harder v. F.C. Clinton, Inc.,* 1997 OK 137, 948 P.2d 298, 303 n. 13. See also *Director, OWCP v. Greenwich Collieries,* 512 U.S. 267, 272–278, 114 S.Ct. 2251, 2255–2258, 129 L.Ed.2d 221 (1994).

80.   *City of Weatherford v. Luton,* 189 Okla. 438, 117 P.2d 765, 767 (Okla.1941); *Consolidated Cut*

*Stone Co. et al v. Seidenbach et al,* 181 Okla. 578, 75 P.2d 442 syl.3 (Okla.1938); *Sackett v. Rose,* 55 Okla. 398, 154 P. 1177, 1181 (Okla.1916); *Ditzler Dry Goods Co. v. Sanders,* 44 Okla. 678, 146 P. 17, 19 (Okla.1915).

81.   See 23 O.S.1991 § 21, *supra* note 24.   See also *Baker & Strawn v. Miller & Jones Bros.,* 109 Okla. 184, 235 P. 476, 478 (Okla.1925), where the Court defined "clearly ascertainable" to mean "without obscurity, obstruction, confusion or uncertainty."

gation to prevent a jury from speculating about damages.[82]

¶ 40   Plenary review of the record evinces that Gulf, as the breaching party, was properly assigned the burden of proving the *fact* of the reductions which it offered to offset Cities' reliance damages.   Gulf's failure to adduce competent evidence by which a jury could gauge its suggested reductions and their monetary value is fatal to its objection to the trial court's directed verdict on the amount of Cities' reliance damages.   The trial court's directed verdict on the amount of Cities' reliance damages is sustained.

## B.

■■■   ¶ 41   Lastly, Gulf urges error in the trial court's order in limine which precludes introduction of evidence about Cities' December 3, 1982 merger with Oxy USA Inc.[83] Gulf reasons that Oxy's merger with Cities and later transactions between Cities, Oxy USA and Occidental Petroleum Company (occurring over the next decade) afford evidence of the value of Cities' settlement with Mesa which the jury should have been allowed to consider.[84]   It asserts that if the evidence which it suggests in its offer of proof had been admitted, it would have established a value in Cities' settlement with Mesa and the stock acquired under the same.

¶ 42   Gulf's assignment of error to the trial court's order in limine was reviewed with a mindful eye to the issues relevant to Cities' breach-of-contract claim then before the trial court.   Gulf's offer of proof was particularly addressed to the damages issue and whether the purchase price Cities paid for the treasury shares repurchased from Mesa should have been reduced because of ascertainable value attributable to the same. Our review of Gulf's offer discloses *no evidence of monetary value specifically as-*

cribed by Oxy to the settlement with, or the treasury shares acquired from, Mesa which is certain or definite enough to sustain a reduction of Cities' reliance damages.[85]   While Oxy assigned value to Cities' general assets to arrive at a purchase price for the corporation, this of itself does not establish *sans proof* that Oxy ascribed value to either the settlement with or the treasury shares that Cities acquired from Mesa.   Gulf's syllogism fails.   Without proof of value for the Mesa settlement and the reacquired stock which is definite and certain, a jury would necessarily have to engage in *impermissible conjecture and speculation* to determine the monetary value of Gulf's suggested reduction.   Further, admission of the evidence (offered by Gulf) of the Oxy USA/Cities merger would precipitate the *introduction of extraneous issues* about the corporate rationales for shifting assets between Cities Service Company, Cities Service Oil and Gas Corporation, Oxy USA, Inc., Occidental Merger Corp., Occidental Petroleum Corporation, Cities Service Holding Company and Occidental Petroleum Investment Co.—all legal entities involved in the Cities/Oxy merger.   Also, attempting to attribute value to the Cities stock acquired from Mesa through a general examination of the *later* Oxy/Cities merger possesses great potential for generating *confusion* regarding the value, if any, of reductions available as offsets to Cities' reliance damages.   This is specially obvious in light of the absence in the offer of proof of an ascription of *monetary* value to the Mesa settlement or the treasury shares in issue by either Cities or Oxy.

■■■   ¶ 43   A trial judge is responsible for the just outcome of a trial and has broad discretion in its conduct.   Unless it appears that a trial court has abused its discretion in reaching a decision, its ruling will not be

**82.**   *Noble Homes, Inc. v. Kalman,* 1967 OK 92, 428 P.2d 241, 246.

**83.**   Cities and Oxy USA executed a merger agreement in August 1982.   The merger itself did not occur until December 3, 1982.

**84.**   Gulf's offer of proof is not temporally limited as its brief in chief implies to the fact that Cities

entered a merger agreement with Oxy USA only three weeks after Gulf repudiated its merger with Cities.   Rather the offer of proof extends to events chronicled in S.E.C. reports filed as late as 1994.

**85.**   *See Bokoshe Smokeless Coal, supra* page —— at 231.

reversed.[86] In light of the submitted record and Gulf's offer of proof, the trial court's *order in limine which excluded evidence of the Oxy USA/Cities merger* was a proper exercise of judicial discretion.[87]

## VI

## CONCLUSION [88]

¶ 44 The arena in which the legal questions *addressed by today's pronouncement* were played out is a cause whose life extended over fourteen years and culminated in 1996 after a three-month trial. Cities' breach-of-contract claim required the trial court to decide two rather straightforward legal questions: (1) Did Gulf breach the merger agreement between itself and Cities when it repudiated the same on August 6, 1982? and (2) What is the proper measure of the non-breaching party's damages in this contract action? The cause's resolution rested on (1) the application of adjective law concerning the preclusive effect which could be extended to earlier-entered decisions of a federal district court and an arbitrator; (2) the admission or denial of evidence in a contentious evidentiary battle intently waged for two years, and (3) the assessment of the adduced evidence to determine whether the amount of damages should be decided as a question of law or be submitted to the jury. Certainly, the uncontested jury's verdict that the treasury shares acquired from Mesa were purchased by Cities in reliance on the merger agreement assisted in this process.

¶ 45 Gulf's defense to its repudiation of the merger agreement was premised primarily on the contract's language. While due process requires that Gulf be given a full and fair opportunity to litigate the availability of the asserted contractual defenses [the FTC defense and the "Annex I(d)(2) & (3)" defenses], the law requires no more than one such opportunity be given to do so. Nonmutual collateral estoppel's application is only sustainable after both the legal criteria for the doctrine's availability and the opportunity to earlier litigate have been assessed.[89] Whether the legal criteria has been met is reviewed de novo and the trial court's assessment of the earlier proceeding to determine if it afforded the party, against whom the doctrine is being applied, a full and fair opportunity to litigate is reviewed under an abuse-of-discretion standard. The trial judge's application of this form of issue preclusion here passes muster under both standards of review and Gulf's defenses were properly precluded. Today's pronouncement recognizes the sanctity of judgments where the parties to the earlier proceedings have been accorded due process. It also gives the law certainty for here it results in the contractual language agreed to by the parties in their merger agreement being given but *one* legal meaning.

¶ 46 Gulf takes umbrage at what it suggests is the trial court's usurpation of the jury's duties in the present cause. We have reviewed de novo her rulings about what at first blush would appear to be factual determinations within the jury's usual domain. Because of the absence of necessary record proof to support submission of Gulf's oil-reserve-defense to the jury, the trial court correctly resolved the issue as a question of law. The trial court properly assigned the burden of proof to Gulf for the reductions which it suggested to Cities' reliance damages. Further, after plenary review of Gulf's offer of proof about the Oxy USA/Cities merger, the trial court's rulings—which precluded introduction of evidence about the later merger and averted the interjection of speculation and confusion into the jury's deliberative process—did not constitute abuses of judicial discretion and are affirmed.

**86.** *Gulf, C. & S.F. Ry. Co. v. Smith,* 270 P.2d 629 syl. 1 & 2, 633 (Okla.1954).

**87.** *Ditzler Dry Goods, supra* note 80 at 19. *See also* 12 O.S.1991 § 2403, whose terms provide:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise.

**88.** Because we do not remand the present case for retrial, we do not reach Gulf's request that the cause be assigned to a different judge upon remand.

**89.** *See* section III above for a complete delineation of the pertinent criteria.

¶47 **THE JUDGMENT OF THE TRIAL COURT IS AFFIRMED.**

¶48 HARGRAVE, V.C.J., LAVENDER, SIMMS, KAUGER and WATT, JJ., concur.

¶49 SUMMERS, C.J., and ALMA WILSON, J., concur in judgment.

¶50 OPALA, J., concurs in part, dissents in part.

¶51 HODGES, J., not voting.

